LUIS S. MURCELO y su esposa FRANCISCA PÉREZ RIVERA, demandantes y recurridos, *v.* H. I. HETTINGER & CO. y PUERTO RICO TELEPHONE CO., demandadas y recurrente la primera.

*Número:* R-63-242     *Resuelto:* 24 de mayo de 1965

*Francisco Ponsa Feliú,* abogado de la recurrente; *Amadeo & Suro,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El 14 de setiembre de 1961, los esposos Luis S. Murcelo y Francisca Pérez Rivera iniciaron una acción contra H. I. Hettinger & Co. y Puerto Rico Telephone Company, ante la Sala de San Juan, del Tribunal Superior, reclamando a éstas $100,000 por los daños y perjuicios sufridos por ellos con motivo de la muerte del niño José Efraín Murcelo Pérez, hijo de ellos.

Se alegó en la demanda, entre otras cosas:

"1. Los demandantes son los padres con patria potestad del menor José Efraín Murcelo Pérez, quien falleciera el 9 de septiembre de 1961 en horas de la tarde, debido a asfixia por inmersión en una excavación que los dos demandados o uno de ellos había dejado sin la protección adecuada a la orilla de la Calle Marginal a lo largo de la Avenida Baldorioty, frente al Edificio 14 del Caserío Lloréns Torres de San Juan, Puerto Rico.

"2. Dichos demandados, a pesar de que sabían o debieron haber sabido que en dicho sitio se reunían niños menores, dejaron sin la debida protección una excavación de alrededor de 8 ó 10 pies de hondo, la cual como consecuencia de las lluvias que para la fecha del accidente que se menciona en esta demanda y para los días precedentes se había llenado de agua, constituyendo un claro peligro para dichos menores.

"3. Mientras el menor José Efraín Murcelo Pérez jugaba en los alrededores de dicha excavación sufrió una caída en la misma, pereciendo ahogado según se alega en el párrafo Primero precedente.

"4. La causa próxima del accidente que se menciona en los párrafos precedentes fue la negligencia crasa de los demandados o uno de éstos al trabajar como agente del otro, al no tomar las debidas precauciones para evitar que menores de edad fueran a caer en la referida excavación."

La demandada H. I. Hettinger & Co. en su contestación solamente expuso: ". . . niega todas y cada una de las alegaciones de la demanda." (¹)

En 6 de octubre siguiente los demandantes notificaron a la recurrida un interrogatorio que ésta contestó bajo juramento. En juicio fueron ofrecidas en evidencia por la parte demandante y admitidas, sin objeción de la demandada, las siguientes preguntas y las contestaciones correlativas:

*Pregunta Núm. 1.* "Diga si el codemandado [*sic*] H. I. Hettinger y Co. realizó alguna labor de excavación en *alguna parte de la calle Marginal* a la avenida Baldorioty y específicamente si *realizó alguna excavación frente al edificio 14 del caserío* Lloréns Torres." *Contestación*: "Sí."

.      .      .      .      .      .      .      .

*Pregunta Núm. 3.* "Describa la labor que la codemandada Hettinger hacía para la codemandada Puerto Rico Telephone allá para el 9 de septiembre de 1961." *Contestación*: "Instalación teléfono subterráneo."

*Pregunta Núm. 4.* "Diga si es cierto o no es cierto que la codemandada Hettinger y Co., sus agentes o empleados *realizaban excavaciones a lo largo de la calle Marginal* a lo largo de la Avenida Baldorioty de Castro de Santurce. Específicamente diga si es cierto o no es cierto que un hoyo fue cavado *frente al edificio número 14* del caserío Lloréns Torres de Santurce." *Contestación*: "Sí."

*Pregunta Núm. 5*: "Diga el tamaño, ancho, largo y hondo a que se refiere la pregunta anterior." *Contestación*: "16′ 4″ de largo; 9′ 10″ de ancho y 10′ de hondo."

*Pregunta Núm. 6*: "¿Cuándo fue excavado dicho hoyo?" *Contestación*: "Agosto 30, 1961."

Fue el caso a juicio el 22 de julio de 1963. La evidencia adicional presentada por la parte demandante se compone de: los testimonios de los esposos demandantes y de Julio Rojas

---

(¹) No haremos mención de las alegaciones y actuaciones en el litigio de la codemandada Puerto Rico Telephone Co. porque la sentencia final la exoneró por completo de responsabilidad, sin que contra ello recurrieran los demandantes. En adelante, al usar la expresión "la demandada" o la voz "recurrente", estaremos refiriéndonos sólo a H. I. Hettinger & Co.

Cruz, una copia del certificado de defunción del niño José Efraín Murcelo, una certificación de la inscripción del Certificado de Nacimiento de ese niño y de una fotografía "del sitio donde ocurrieron los hechos."

Cuando llegó a la demandada su turno de presentación de evidencia manifestó que no tenía prueba que ofrecer y que así sometía el caso. (²)

Habiendo la demandada impugnado el fallo recurrido fundada principalmente en que "la prueba presentada es insuficiente como cuestión de derecho", haremos una reseña de la evidencia aportada por la parte actora.

Evidencia Procedente de los Interrogatorios. Ya hemos visto que por las propias admisiones, bajo juramento, de la demandada, ésta, el 30 de agosto de 1961, realizó una labor de excavación *en una calle pública marginal* a la avenida Baldorioty de Santurce, *frente al edificio 14 del caserío público Lloréns Torres*, para la instalación del sistema del teléfono subterráneo, cavando allí un hoyo que medía 16 pies cuatro pulgadas de largo, nueve pies 10 pulgadas de ancho y 10 pies de profundidad.

Certificado de Defunción. Ex. I. Del mismo surge que el niño José Efraín Murcelo Pérez falleció el 9 de setiembre de 1961 y que la causa inmediata que produjo su muerte fue "Asfixia por submersión."

Certificación de Nacimiento. Ex. II. Revela que José Efraín Murcelo Pérez, hijo de Simplicio Murcelo y de Francisca Pérez, nació el 9 de abril de 1953.

---

(²) En la etapa del llamamiento y juramentación de testigos la demandada informó al tribunal que sus testigos se llamaban José Santos, Gonzalo Girau, José M. Rivera y que además tenía como testigo a "otro señor que está presente en la Sala" y a un "miembro de la uniformada que está de servicio en Mayagüez." El 27 de octubre de 1961, en su contestación jurada a un interrogatorio de los demandantes, la demandada les había informado que también contaba con los testigos Librada Huertas, Sergio Santiago, Víctor Colón y Juan Luis Rosado, residentes del caserío Lloréns Torres y con "Rufino Colón c/o Hettinger & Co.", para su defensa. *Bajo el juramento de esa contestación también les informó que dicha Librada Huertas presenció el accidente.*

Fotografía de la excavación. Ex. III. Representa la salida o boca del hoyo, cubierta parcialmente por una especie de tablero. A lo largo del hoyo aparece un hueco que más o menos es del ancho de una de las tablas que componen el mencionado tablero.

Esta fotografía, con la objeción de la demandada, fue admitida "a los efectos de ver en qué forma le es útil al Tribunal en el final esclarecimiento de los hechos en este caso."

Declaración de Francisca Pérez. Expresó, en lo pertinente, esta codemandante, que estaba casada con Luis Simplicio Murcelo; era la madre del niño Efraín "el muertecito"; éste tenía 8 años para setiembre de 1961; vivía con ellos; tenían cuatro hijos; vivían en el edificio 16, apartamiento 325, del caserío Lloréns Torres; se dedicaba a las labores de su hogar; ese día—9 de setiembre de 1961—". . . yo estaba atareada, lavando, almidonando, lavando piso, y cuando subió el nene [Efraín] que *estaba por allí jugando,* me dijo: 'Mami, dame dos chavos', y me dijo: 'que voy a comprar unos juguetitos'; y yo entonces cogí y me paré y le dí los dos centavos; y *como a los quince o veinte minutos* subió el nene hijo de la señora que está allí sentada y me dice: 'Doña' . . ." (se hizo aquí objeción). Siguió declarando: que su hijo iba a comprar algo en la tienda "al lado, allí, que venden bombones y esas cosas"; dentro del caserío, "fue a comprar un juguetito que le dicen creo que 'hicotelo' o algo así"; que su hijo Efraín era "el más chiquito"; se enteró que algo le había pasado cuando llegó a su casa otro nene hijo de otra señora; que entonces "fui detrás de la Policía a todo escape y después vino la Policía", le afectó la muerte de su hijo; la excavación se había hecho como a unos cien metros de donde ella vivía con sus hijos; no había visto esa excavación antes del día del accidente; por primera vez la vio ese día; su hijo, en ese día, andaba como a cien metros de su casa *"donde mismo acostumbraban estar los nenes";* consideraba que en ese sitio, dis-

tante unos cien metros de su casa "era el sitio para él jugar, los alrededores"; no había puesto a Efraín en la escuela porque era chiquito "y había que cruzar la avenida", y allí ha habido casos de dos que los carros los han cogido. . .", y estaba esperando que cumpliera los nueve años para enviarlo.

Declaración de Julio Rojas Cruz. En lo pertinente declaró que el día 9 de setiembre de 1961 "estaba en el bar Doña Carmen, cuando miré así, vi mucha gente . . . en el sitio donde estaba la excavación . . . me acerqué al lugar y había un policía . . . le pedí permiso a ver si él me dejaba sumergirme en la excavación para sacar a la víctima"; que el agua era negra y por eso no podía ver el fondo; después de conversar con el policía "El me dijo que yo podía bajo mi responsabilidad, y yo dije 'Como no', y entonces con todo y ropa me tiré hasta que saqué a la víctima", *lo ayudó Juan Luis Rosado;* pudo bajar "Pues estaba en una de las esquinas hueco". Identificó la fotografía de la excavación. Cuando se le interrogó: ¿Y cuando usted se tiró adentro de esa excavación, a qué parte de esa excavación se refiere usted? contestó: "Yo diría que esta excavación tenía un segundo hueco en la parte izquierda. Le faltaban tablas a la derecha y a la izquierda también." Esto último, a petición del letrado de la demandada fue eliminado, porque no aparecían los dos huecos en la fotografía y porque "no se le preguntó." La fotografía sólo cubría parte del tablero y un hueco; no cubría el sitio donde decía el testigo que estaba el otro hueco. Continuó declarando que a través de las "tablas que faltaban en la excavación" fue que se tiró a buscar a la víctima; "traté unas tres veces hasta que por último opté precipitarme por una de las alfajías hasta que logré sacarlo;" lo que había allí adentro era "el cadáver del niñito".—Las partes entonces estipularon que lo sacado de la excavación "era el cadáver del niñito"—; que no vio celadores cerca de la excavación; ni ésta estaba en tal forma que se impidiera el acceso hasta ella, pues no tenía verja; que no tuvo que saltar verja alguna para

llegar hasta la excavación; que la excavación estaba en los terrenos del casería Lloréns Torres, "entre el edificio 13 y el edificio 12," la había observado antes de ese día porque solía ir por allí con frecuencia.

Siguió declarando que había sacado al niño aproximadamente a las cinco de la tarde del sábado 9 de setiembre de 1961. Identificó al policía José M. Rivera, que estaba en corte, como el policía que en aquella tarde le había permitido bajar al fondo de la excavación.

Declaración de Luis S. Murcelo. Este codemandante, padre del niño ahogado, en lo pertinente declaró: Se encontraba trabajando en San Juan en la tarde del 9 de setiembre de 1961; llegó al sitio de su trabajo en San Juan un vecino suyo y le avisó; con motivo del aviso "enseguida cogí un taxi y vine a mi casa. . . llegué al sitio de los hechos y vi aglomeración de mucho público. . . eso fue en la avenida, por la parte de allá de Lloréns Torres, por el edificio 13. . . y cuando yo me acerqué ya lo habían sacado del hoyo y estaba encima del tablero. . . un nene, el hijo mío. . . ya no tenía vida. . . con la emoción que yo sufrí allí, cogí al nene. . . y yo me fui al hospital con él. . .". Continuó declarando que hacía 10 años que vivía en el caserío, que conoce bien los alrededores del caserío; que el sitio en que se había hecho la excavación era frecuentado por niños; que allí a veces jugaban niños que vivían por esos alrededores; que con motivo de la muerte de su hijo tuvo sufrimiento, enfermedades, angustias. Declaró también que había visto la excavación antes del 9 de setiembre de 1961 y que "lo venía viendo antes", debido a que "por allí es más cerca para uno cruzar para salir a Muñoz Rivera a comprar cosas para el hogar, pues pasaba por allí."

El tribunal de instancia, a la luz de esa prueba hizo las siguientes expresiones y determinaciones sobre los hechos:

"Las conclusiones de hecho están basadas exclusivamente en la prueba que presentaron los demandantes. La misma no ha sido

controvertida en forma alguna, ya que como hemos señalado anteriormente, los demandados se abstuvieron de presentar pruebas. No hay, por lo tanto, conflicto de prueba para ser resuelto por este Tribunal.

## "CONCLUSIONES DE HECHO

"De un estudio y análisis de la prueba practicada y admitida, el Tribunal entiende que los siguientes hechos han sido debidamente probados:

"1—Para allá para los meses de agosto y septiembre de 1961, la codemandada H. I. Hettinger & Co., bajo contrato con la otra demandada Puerto Rico Telephone Co., estaba llevando a cabo en unos terrenos adyacentes al Caserío Lloréns Torres unas excavaciones para instalaciones telefónicas. Una de éstas que fue cavada frente al Edificio Número 14 en el Caserío, tenía dimensiones de 16 pies 4 pulgadas (16′ 4″) de largo por 9 pies 10 pulgadas (9′ 10″) de ancho y 10 pies (10′) de hondo.

"2—El menor José Efraín Murcelo Pérez vivía en compañía de los demandantes en uno de los apartamientos del Edificio Número 16 del Caserío. El sitio donde se hizo la excavación frente al Edificio Número 14 eran con anterioridad a y durante la construcción de dichas obras, sitio usual de juego de los niños que vivían en aquel caserío.

"3—El 9 de septiembre de 1961 en horas de la tarde, el menor José Efraín Murcelo Pérez quien a la sazón contaba ocho (8) años de edad, cayó dentro de la excavación a que hemos hecho referencia, la cual estaba llena de agua oscura. La caída fue a través de una abertura que existía en la boca de dicha excavación según la misma aparece de la fotografía que fue presentada en evidencia.

"4—Después de caer el menor dentro del agua que llenaba la excavación, fueron en su auxilio los señores Julio Rojas y Juan Luis Rosario que se encontraban en los alrededores y aunque con dificultad por lo oscuro y sucio de las aguas, lograron finalmente traer al menor a la superficie. La prueba demuestra que el menor murió ahogado debido a asfixia por inmersión.

"5—No había, en la ocasión en que ocurrió el accidente, ninguna persona empleada por las demandadas en los alrededores de la excavación, ni barreras o cercas que impidieran el acceso de niños hacia las obras.

"6—El menor José Efraín Murcelo Pérez tenía ocho (8) años y debido a su tierna edad y a lo oscuro de las aguas que llenaban la excavación, no podía razonablemente comprender lo peligroso de la excavación que mantenía en dicho lugar la demandada H. I. Hettinger & Co.

"7—La propia prueba de la parte demandante demuestra que quien estaba en control de las obras era H. I. Hettinger & Co., sin que nada en la prueba desfilada ante el Tribunal surgiera [*sic*] que la codemandada Puerto Rico Telephone Company tenía intervención o ingerencia en los trabajos que se realizaban.

"8—La causa próxima y única del accidente sufrido por el menor hijo de los aquí demandantes, es la negligencia de la demandada H. I. Hettinger & Co. al no mantener, especialmente en horas en que era lógico suponer y esperar que niños menores de edad podían acercarse a la excavación, medios que evitaran la condición de peligro que ella constituía. De la fotografía que obra en autos surge claramente que se hubiera requerido de la demandada una inversión mínima para mantener totalmente cubierta la excavación y así evitar accidentes como el ocurrido al menor José Efraín Murcelo Pérez.

"9—Los demandantes Luis S. Murcelo y su esposa Francisca Pérez Rivera son los padres del menor fallecido, quien vivía con ellos en el Caserío Lloréns Torres. Como consecuencia de la muerte del referido menor, estos demandantes sufrieron angustias mentales y la pena que es de esperarse por la muerte de un ser querido. El Tribunal estima los daños de los demandantes en la suma de QUINCE MIL DOLARES ($15,000.00)."

En sus conclusiones de derecho el tribunal de instancia determinó (1) que eran de aplicación al caso los Arts. 1802 y 1803 del Código Civil; (2) que la demandada al mantener la plataforma de madera que cubría la excavación con una abertura en la misma creó una trampa que ofrecía un peligro claro y patente para un niño, especialmente si se tenía en consideración que el agua estancada en la excavación era oscura y sucia, lo que no permitía apreciar su profundidad; (3) que la demandada fue negligente al establecer tal condición en los terrenos de un caserío público que eran utilizados como área recreativa, hecho éste que dicha demandada conocía

o razonablemente debió haber conocido; (4) que los hechos situaban claramente al caso dentro de una de las excepciones contempladas en *Vargas Rodríguez* v. *Fuentes Fluviales,* (3) 86 D.P.R. 104 (1962); (5) que la demandada no solamente "pudo o debió haber previsto la presencia de niños alrededor de la excavación surge claramente de su conducta al cubrir, aunque impropiamente, la misma con una plataforma de madera, sino que el haber obviado el peligro para dichos menores no hubiera representado gasto de importancia para ella. Sólo bastaba hacer la plataforma un poco más grande de suerte que cubriera toda la excavación," y que el niño no era totalmente un transgresor.

Concluyó también el tribunal sentenciador que la demandada había sido "temeraria en la defensa de este litigio" y que procedía que se le impusiera el pago de honorarios de abogados en la suma de $1,500.00.

(3) Se trató en ese caso de un niño ahogado en un canal de riego. El texto completo del párrafo que de esa decisión citó el tribunal sentenciador es así:

"La regla que acabamos de exponer tiene excepciones. Entre otras, está la que le impone responsabilidad al dueño del sitio donde están localizados los cuerpos de agua, si estos presentan o contienen artefactos que los hagan atractivos, *Davies* v. *Land O' Lakes Racing Ass.,* 69 N.W.2d 642 (Minn. 1955) o constituyen una trampa y ofrecen un peligro claro y patente. *Saxton* v. *Plum Orchards,* 40 So.2d 791 (La. 1949). Otra circunstancia a considerarse es la localización; si están cerca de poblados o de carreteras, *Banker* v. *McLaughlin,* 208 S.W.2d 843 (Tex. 1948). Una piscina en un sector poblado, recientemente se consideró que caía dentro de la excepción. *King* v. *Lennen,* 1 Calif. Rptr. 665 (1959); ver Nota 9 Stan. L. Rev. 204 (1956). También es factor a considerar si los alrededores del sitio donde está localizado el cuerpo de agua es utilizado por los niños como área recreativa, y el dueño conoce o razonablemente debiera conocer ese hecho. *Altenbach* v. *Lehigh Valley R. Co.,* 37 A.2d 429 (Pa. 1944); *Barlow* v. *Gurney,* 29 S.E.2d 680 (N.C. 1944). Pero véase *Torres* v. *Wirshing & Cía.,* 78 D.P.R. 645 (1955). Sería prácticamente imposible fijar de antemano en qué circunstancias se podría imponer responsabilidad por vía de excepción. Así, cada caso deberá ser considerado y resuelto de acuerdo con los hechos que presente. *Díaz Pérez* v. *Estado Libre Asociado,* Civil Núm. 12274, resuelto el 11 de junio de 1959. Prosser, *Trespassing Children,* supra, a la págs. 460–461."

Fundado en esas conclusiones dictó sentencia el 6 de setiembre de 1963 declarando con lugar la demanda solamente respecto a H. I. Hettinger & Company, imponiéndola al pago de $15,000.00 como indemnización por los daños sufridos por los demandantes y de $1,500.00 por concepto de honorarios de abogado.

En este recurso la demandada descansa en el memorándum que presentó con su petición de revisión. Resumiendo allí su posición nos dice: "Puede verse que la contención de la recurrente es que los demandantes, de acuerdo con su propia prueba, no tienen derecho a sentencia a su favor, o lo que es lo mismo, que la prueba presentada es insuficiente como cuestión de derecho." Sostiene también que la sentencia dictada es pura especulación e inferencia y que se hizo una indebida aplicación de la Regla *res ipsa loquitur* porque no se había demostrado relación causal entre el daño que se reclamaba y la actuación de la recurrente. No tiene razón, la sentencia debe ser confirmada.

■ El propietario de cosas inanimadas, el que tenga con ellas duradero e inmediato contacto, su utilidad o se sirva de las mismas para su provecho, y a veces su arquitecto o constructor, están obligados a reparar los daños causados o inferidos por tales cosas inanimadas interviniendo la culpa o negligencia de ellos.

■ Nuestro Código Civil, en sus Arts. 1807, 1808, 1809 y 1810 formula la declaración de responsabilidad enumerando las siguientes cosas que principalmente pueden causar o dar ocasión a estos perjuicios: (1) los edificios ruinosos, (2) las máquinas que causen explosiones, cuando "no hubiesen sido cuidadas con la debida diligencia"; (3) las sustancias explosivas que se inflamaran y que "no estuviesen colocadas en lugar seguro y adecuado"; (4) los humos excesivos que sean "nocivos a las personas o a las propiedades"; (5) los árboles caídos "en sitio de tránsito" y cuando la caída no sea ocasionada por fuerza mayor; (6) las cloacas o depósitos de mate-

rias infectantes que produzcan emanaciones y que hubiesen sido "construídos sin las precauciones adecuadas al lugar en que estuviesen". Se responsabiliza al jefe de familia que habita una casa o parte de ella, por los daños causados por las cosas que se arrojaren o cayeren de la misma.

Esta enumeración que el Código hace no es agotadora; no tiene el carácter de *numerus clausus;* admite la posibilidad de incluir cualesquiera otras cosas inanimadas que puedan producir similares efectos y constituir fuentes de perjuicios. (4)

Considerando los hechos y todas las circunstancias concurrentes del caso, la recurrente es civilmente responsable de los daños y perjuicios sufridos por los demandantes.

▇▇ En primer lugar, porque en cierto sentido legalmente puede ser aplicable a estos hechos la doctrina del peligro atrayente. La condición de fácil accesibilidad a la agencia productora del daño es un factor muy importante a considerar. *Best* v. *District of Columbia*, 291 U.S. 411 (1934). La jurisprudencia angloamericana concede gran importancia en la aplicación de la doctrina al factor de la localización. Como consecuencia de ello una cosa inanimada que de encontrarse en predios privados no podría ser considerada como un peligro atrayente, podría ser así caracterizada considerando el hecho mismo de su localización, es decir por estar situada en una vía pública. Anno., *Liability of Landowner for Drowning of Child,* 8 A.L.R.2d 1254, cit. esp. pág. 1289; *Halmberg* v. *Chicago,* 244 Ill. App. 505 (1927); *Indianapolis* v. *Emmelman,* 108 Ind. 530, 9 N.E. 155 (1886). Esa distinción tiene el efecto de obligar a aquellos que usan nuestros terrenos y vías públicas alterando su estado o

---

(4) Véanse, entre otros: *Vélez* v. *La Capital,* 77 D.P.R. 701 (1954), daño producido por las raíces de un árbol; *Gutiérrez* v. *Bahr,* 78 D.P.R. 473, 475 (1955), daño sufrido por condiciones de inseguridad de un local de joyería. En este caso, entre otras cosas, dijimos: "El daño causado por cosas inanimadas cae dentro de la figura de la omisión, omisión del cuidado tutelar para la protección de la vida o propiedad ajenas".

condición natural, a tomar todas las medidas necesarias para evitar que accidentes previsibles como el presente ocurran.

■ En segundo lugar, si dejáramos de aplicar a estos hechos la doctrina del peligro atrayente, todavía podríamos imponer responsabilidad a la recurrente. Su actuación, al excavar una vía pública, alterando, de esa manera, su condición o estado normal llevaba consigo el deber de su parte, de tomar todas aquellas medidas necesarias, no solamente para restaurar la referida vía a su estado original una vez terminada su labor, si que también en el ínterin, tomar las debidas precauciones para evitar que toda persona—sin importar su edad, sexo y condición—que transitara por la misma pudiera hacerlo, libre del riesgo de sufrir un accidente como resultado o producto de esa alteración. Shearman & Redfield, *A Treatise on the Law of Negligence*, Vol. II pág. 875; *Smith* v. *Foley Constructing Co.*, 237 N.Y. 601, 143 N.E. 759; *Charlock* v. *Freal*, 125 N.Y. 357, 26 N.E. 262. Más aun cuando se trata, como en este caso, de una vía pública situada en zona densamente poblada.

La actuación de la recurrente, al situar o mantener un tablero incompleto sobre la excavación, al no vallar o cercar sus alrededores, al no fijar avisos o letreros señalando la alteración de la referida calle marginal, al permitir la acumulación de agua producto de las lluvias en el mencionado hoyo, teniendo los medios necesarios para evitar tal acumulación, todo esto, junto al hecho de que la excavación fue realizada en una vía adyacente a una urbanización pública densamente poblada, donde crece y se desarrolla una porción substancial de nuestra población juvenil, nos lleva a la ineludible conclusión de que fue precisamente el incumplimiento de sus deberes y su actuación negligente la única causa del accidente.

Su alegación, en el sentido de que las alegaciones y la prueba son insuficientes para descubrir la agencia o cosa catalogada como peligro atrayente, es también insostenible.

Tanto las alegaciones como la prueba señalaron, las medidas, condición física, localización y demás detalles relacionados con la excavación las cuales en conjunto aportaron una descripción suficiente del lugar, cosa o condición caracterizada como peligro atrayente por el tribunal a quo.

Además señala la recurrente, la negligencia contributoria de los demandantes; y el menor como la causa próxima del accidente.

■ Nada hemos encontrado en las alegaciones de la recurrente ni en la evidencia elevada ante nos, que nos indique que tal señalamiento fue levantado en el tribunal inferior. Por el contrario, de esos documentos claramente surge que la recurrente se limitó a descansar en la prueba presentada por los demandantes, sin levantar defensa o teoría alguna en su favor ante dicho tribunal. Ante esa situación, este Tribunal, no considerará cuestiones que no fueron planteadas por las partes ni consideradas por el tribunal inferior. *Sucn. Escalera* v. *Barreto*, 81 D.P.R. 596 (1959); *McCormick* v. *McCormick*, 52 D.P.R. 691 (1938).

Siempre el juzgador se encuentra en la ineludible necesidad de emitir un fallo con un determinado contenido. No debe rehusar fallar a pretexto de silencio, obscuridad o insuficiencia de la ley o por cualquier otro motivo cuando existe un agravio por reparar o los derechos ajenos han sido ilegalmente invadidos.

■ Sabemos que la parte que sostiene la afirmativa en la cuestión deberá presentar la evidencia para probarla.—Arts. 1168, Código Civil y 108 y 162, pár. 5, Ley de Evidencia. Pero, por regla general, la ley no exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza; porque tal prueba—asegura la propia ley—es rara vez posible. Sólo se exige la certeza moral, o un grado de prueba que produzca convicción en un ánimo no prevenido. No se tiene que probar el caso con exactitud matemática mediante evidencia directa, ni de modo concluyente, ni que

produzca un grado tan perfecto de convicción que no admita la posibilidad de la prueba en contrario. El litigante puede probar su caso con evidencia indirecta, que es de dos clases, inferencias y presunciones. Es inferencia, la deducción que de los hechos probados, o acreditados completamente, hace en su discernimiento el juzgador. A veces se denomina presunción *hominis*. Representa ese discernimiento una actividad humana valorativa de comparación o confrontación, un proceso interno que constituye, a juicio del profesor Serra Domínguez, (5) algo inabordable; el movimiento de la razón yacente en el hombre.

En este tipo de acción la parte demandante luego de haber presentado evidencia a cuya luz una persona razonable pueda quedar convencida de que el acto dañoso se debe a la culpa u omisión de la demandada no está obligada a eliminar o excluir toda otra posible causa del suceso del cual se deriva la responsabilidad exigida. Aun en el campo penal, cuando El Pueblo sólo ofrece evidencia circunstancial de culpabilidad, ya no tiene que ser ésta inconsistente con cualquier hipótesis razonable de inocencia. *Pueblo* v. *Bonilla*, 78 D.P.R. 152 (1955).

Como hemos visto la demandante presentó prueba específica sobre los hechos que acreditaron, mediante el establecimiento de inferencias a base de tales hechos, la forma en que ocurrió el accidente, no pudiendo tener ningún efecto la aplicación o no aplicación de la doctrina de *res ipsa loquitur*.

Afirma también la recurrente: "El tribunal sentenciador descansa en la doctrina de 'peligro atrayente'. Mejor dicho, descansa en las excepciones que responsabilizan al demandado invocando esa doctrina. Y citando a *Vargas* v. *Autoridad de F.F.*, 28 de septiembre de 1962, se apoya en las excepciones señaladas en la decisión, bajo las cuales se responsabiliza al demandado."

---

(5) Véase su interesante obra *"Normas de Presunción en el Código Civil"*, pág. 6; Ediciones Nautas, S.A., Barcelona, 1963.

■ La doctrina del peligro atrayente, producto de una insatisfacción judicial ante los resultados obtenidos al aplicarse a niños la regla general de que los dueños y propietarios de terrenos no son responsables de los daños causados por condiciones físicas peligrosas existentes en sus predios cuando los perjudicados sean meros transgresores, encierra en su arca legal el reconocimiento judicial real y positivo de que un niño, debido a su ingenuidad, inmadurez y poco juicio, no es capaz de captar todos peligros en que ha de enfrentarse al transgredir los límites de una propiedad ajena. Sus principios recogen, además, la realidad práctica de que los padres no pueden ni deben aprisionar a sus hijos entre cuatro paredes, así como que, tampoco pueden seguir todos sus pasos. El régimen legal al confrontarse con el conflicto de intereses creado entre los propietarios, de un lado, y la sociedad en protección de su niñez, de otro, debe ceder ante la segunda, obligando a los primeros a tomar ciertas medidas de precaución cuando las condiciones existentes tiendan a demostrar la posibilidad de la presencia de niños en, o alrededor de sus propiedades. Tal doctrina no reconoce una completa protección del niño, en cuanto a todo lo que es posible pensar que pueda sucederle, sin embargo, exige ciertos requisitos mínimos de previsibilidad y protección que de no cumplirse hacen responsable a dichos propietarios por los daños causados. Se ha dicho que la verdadera razón o fundamento de la doctrina estriba en la previsibilidad del daño causado al niño y las consideraciones de tipo humanitario y de política social, que, como en otros casos de negligencia, operan para traer a relieve un compromiso entre los intereses en conflicto y así limitar en una extensión razonable el privilegio del propietario de actuar a su mero deseo sin tomar en consideración la protección de los demás. (6)

■ Al principio, dicha regla era aplicada únicamente cuando la agencia generadora del daño (el peligro atrayente

(6) Prosser: *Law of Torts* (supra) pág. 440.

en sí) era poseedora de ciertas cualidades físicas que producían en la mente del niño una tentación, encanto o atracción (*allurement*) que lo incitaban a acercarse a la cosa, produciéndose por tal razón el accidente. Prosser *Trespassing Children*, 47 Calif. L. Rev. pág. 427; *United Zinc & Chemical Co.* v. *Britt*, 258 U.S. 268 (1921). Sin embargo, hoy día, el peso de la autoridad ha aceptado la aplicación de la misma aun faltando tal elemento de atracción. Dicha cualidad será únicamente considerada a los efectos de determinar si debido a la existencia de tal elemento atractivo debió el propietario prever la presencia y transgresión de sus predios por parte de niños.

Al aplicar la regla a casos específicos para efecto de responsabilizar legalmente al propietario, las cortes han señalado varios criterios o factores que deben ser considerados y estar presentes como requisito a la determinación del deber de previsión que ha de ser impuesto al propietario. Así el hecho de que la *agencia generadora se encuentre próxima a, o esté situada en lugares donde niños suelen pasar o jugar; la accesibilidad a la cosa o condición peligrosa;* la determinación de que han ocurrido otras transgresiones similares con anterioridad y el hecho, antes mencionado, de que la cosa posee intrínsecamente ciertas cualidades atrayentes, han sido criterios predominantes en dicha determinación.

Como acertadamente expresó el tribunal de instancia, la forma negligente de mantener esa excavación por tanto tiempo, dentro de ese caserío, "creó una trampa que ofrecía un peligro claro y patente para un niño . . . especialmente si se tiene en consideración que el agua estancada en la excavación era oscura y sucia lo que no permitía ver la profundidad de la misma."

Esa trampa, añadimos, significaba grave riesgo potencial para niños que por allí jugaran, para mayores de edad y para toda persona que por allí transitara. En esos sitios concu-

rridos por niños se debe esperar que éstos hagan precisamente lo que sugiere la recurrente: o que en sus juegos pasen cerca de las excavaciones llenas de agua, o traten de saltar sobre ellas, que no miren al sitio donde juegan o que en su estado de inocencia se lancen voluntariamente dentro de esos pequeños cuerpos de aguas turbias de profundidad engañosa. Concurriendo las circunstancias concretas del presente caso, la creadora y mantenedora de la cosa inanimada peligrosa o de la situación de grave e irrazonable riesgo, debe responder de las consecuencias de haber omitido aquella diligencia que exigía la naturaleza de sus claros deberes y que correspondía a las circunstancias de las personas, del tiempo y del lugar. —Véanse Arts. 1057 y 1803, Código Civil.—Sin duda alguna el daño sufrido por el niño fue consecuencia necesaria de la omisión culpable de H. I. Hettinger & Co., y ello constituye el nexo causal en este caso.

La evidencia presentada al efecto, de que el cadáver del niño fue encontrado en la señalada excavación; de que sólo habían transcurrido quince o veinte minutos desde que el desafortunado niño fuera visto con vida hasta que su cadáver fuera extraído de la excavación; la existencia de la abertura al momento en que el testigo Rojas Cruz solicitó permiso al agente del orden público para introducirse en la excavación en busca del cadáver y la condición negra de las aguas en aquellos instantes, todo esto en conjunto, es suficiente para justificar las inferencias establecidas por el Tribunal a quo. Análogas inferencias estableció el Tribunal Supremo de Luisiana en el caso de *Saxton* v. *Plum Orchards*, 40 So.2d 791 (1949). Allí había ocurrido un accidente muy similar al presente y dicha corte señaló lo siguiente:

"En esta corte la defensa llama la atención al hecho de que no hubo testigos oculares del accidente y los demandantes no han ofrecido ninguna prueba directa de la muerte debido a asfixia por inmersión. Señala en su alegato lo siguiente: 'Hay la posibilidad de que fuera tirada o empujada en el estanque por una ter-

cera persona'. Este punto no fue aparentemente levantado en la Corte de Apelaciones, ya que no hemos encontrado ninguna mención del mismo en el alegato de la defensa allí radicado o en la opinión de aquella corte. *Sea como fuere, surge de la evidencia circunstancial presentada una fuerte inferencia de que la niña entró o cayó en el estanque y que su muerte se produjo al ahogarse. Su cuerpo fue encontrado en el estanque; la respiración artificial que le fue administrada produjo cierta cantidad de agua y nadie fue visto en o cerca del estanque durante las horas en que la niña estuvo perdida. Ya que esta inferencia no ha sido derrotada o rebatida, será aceptada como que establece la manera o causa de la muerte.*" (citas) (Énfasis nuestro.)

Arguye la recurrente que la prueba presentada es insuficiente como cuestión de derecho, para concluir que la causa próxima del accidente fue su negligencia al no mantener medios que evitaran la condición de peligro.

Pretende ésta como consecuencia del hecho, ajeno a los recurridos, de que no hubo testigos oculares del accidente poner a éstos en la dificultosa situación de probar su caso excluyendo toda otra posibilidad. Esa no es su obligación. Ya hemos expresado la extensión de la obligación de los demandantes en cuanto a la responsabilidad probatoria se refiere. La Corte Suprema de Idaho al encontrarse en una situación de hechos parecida a la que ahora consideramos dijo:

"Muy pocas cosas hay en los asuntos humanos y especialmente en litigios que envuelvan reclamación de daños, que puedan establecerse a tal grado de absoluta certeza, como para excluir la posibilidad, o aun alguna probabilidad, de que otra causa o razón haya podido ser la causa o razón verdadera de los daños, antes que la alegada por los demandantes. *Pero no puede permitirse que tal posibilidad o aun probabilidad pueda derrotar el derecho a recobrar, cuando el demandante ha presentado ante el jurado suficientes hechos y circunstancias alrededor del accidente, como para justificar* a un jurado razonable al concluir que la alegada cosa fue la causa principal y próxima y no es necesario excluir la posibilidad o aun otra probabilidad, de que otra causa o razón

pueda haber sido la verdadera causa o razón de los daños, antes que la alegada por el reclamante." (7) (citas) (Énfasis nuestro.)

Expusimos que la demandada optó por no presentar evidencia alguna. A menos que por ley la carga de la prueba le corresponda, una parte demandada no viene obligada a ofrecer evidencia para contradecir la ya ofrecida por la parte demandante, si estima que la de ésta es insuficiente para la concesión de cualquier remedio. Pero ello conlleva riesgos, puesto que, en su día la decisiva y justa estimación o apreciación del peso, crédito y valor probatorio de la evidencia la hará exclusivamente el juez sentenciador, y ella podrá o no coincidir con la de la parte demandada. Más seria es la situación cuando, como en este caso, bajo juramento, la demandada informa a la demandante que la señora Librada Huertas había presenciado el accidente y que contaba con ella para su defensa, y deja de presentarla como testigo sobre punto tan importante en el caso, dando lugar a la aplicación de la presunción de que toda evidencia voluntariamente suprimida resultará adversa si se ofreciera—Art. 102 (5) Ley de Evidencia—y a la regla de que la evidencia deberá estimarse no sólo por su valor extrínseco, sino también con arreglo a la prueba que una parte estuviera en aptitud de presentar, y la otra de contradecir, del Art. 162 de esa ley. Todo ello le resta firmeza y méritos a la contención de la demandada de que la prueba de los demandantes era insuficiente en derecho, a base de no haberse probado con evidencia directa la forma o modo en que el niño había caído dentro de aquel pozo de aguas sucias que sin la debida y pública protección, durante 10 días, mantuvo H. I. Hettinger & Co., las 24 horas del día y de la noche, en el centro de una estrecha calle marginal utilizada a veces para juego de niños y siempre

---

(7) *Hendrix* v. *City of Twin Falls*, 29 P.2d 352 (1934); véase además, *Town of Flagstaff* v. *Gómez*, 202 Pac. 401 (1921); Prosser, *Law of Torts*, supra; Harper & James, *The Law of Torts*, Vol. 2, págs. 1063 y sigtes. Véase *Morales Muñoz* v. *Castro*, 85 D.P.R. 288 (1962) y *Pace* v. *American Radiator, etc.*, C.A. 7, 5-5-65, 33 U.S.L. Week 2591.

para el tránsito por todo un gran y denso conglomerado humano, [8] constituyendo ello una grave e irrazonable situación de peligro.

Arguye también la recurrente que la alusión que el juez sentenciador hace al testimonio de *Juan Luis Rosario* y la existencia en los autos de cierta deposición dada por esta persona "demuestra que el juez consideró la deposición al resolver el caso." En el resumen que dimos de la declaración del testigo Julio Rojas Cruz relatamos que éste declaró que en su lucha por sacar al niño de la excavación lo había ayudado Juan Luis Rosado, no Juan Luis Rosario como lo nombra la demandada y el propio tribunal de instancia. Esta persona no declaró. Sin embargo, el tribunal recurrido, hizo constar en su relación del caso—no en sus conclusiones—que "la evidencia oral presentada por las demandantes consistió en los testimonios de ambos y los de Julio Rojas y Juan Luis Rosario". La inclusión del nombre de éste resulta un mero e inocuo error en la relación de los nombres de testigos. No existe en los autos indicio alguno que sostenga la inferencia que hace la recurrente en su alegato. Quizás, de haber declarado esta persona, hubiera sido en el sentido de corroborar lo dicho por Rojas Cruz. Por otro lado no se ha elevado ante nos con los autos originales, ni con la petición de revisión, la aludida deposición.

Respecto a la imposición del pago de honorarios de abogados no encontramos motivos para eliminarla.

*Se confirmará la sentencia recurrida.*

---

(8) El caserío Lloréns Torres, construido entre los años 1950 y 1954, en un predio de 86 acres de terreno, se compone de 144 edificios de varios pisos, divididos en 2,610 apartamientos o unidades de viviendas. Para agosto y setiembre de 1961 formaba una ciudad de unos 14,000 habitantes, siendo entonces su población mayor que la ciudad de Humacao. Un 47.7% de esta concentración humana estaba formada por 6,641 niños menores de 14 años. Véase la publicación *Preliminary Study for the Plan for the Transformation of Luis Lloréns Torres Public Housing Project,* editado por la Corporación de Renovación Urbana en 1963.