ÁNGEL LÓPEZ MORALES y su esposa MARÍA DEL CARMEN SANTIAGO, demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrente.

*Número:* R-67-187        *Resuelto:* 3 de abril de 1970

*José A. Arabía* y *Carlos M. Díaz Lamoutte,* abogados de la recurrente; *Miguel A. Giménez Muñoz* y *Eliots A. Zeno Villafañe,* abogados de los recurridos.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Con motivo de morir ahogado el menor Ángel Ildefonso López Santiago, apodado Kelly, en 22 de noviembre de 1962 en el Lago de Patillas, sus padres, los aquí recurridos, demandaron en daños y perjuicios a la recurrente y al Estado Libre Asociado. El tribunal de instancia concluyó que:

"Que el lago en cuestión, y, en el lugar preciso del accidente, era habitualmente transgredido por niños de corta edad, que acudían al mismo a nadar, pescar, pasear en botes, etc., lo que era de conocimiento de la codemandada, Autoridad de las Fuentes Fluviales de Puerto Rico, ya que anteriormente habían ocurrido en el mismo accidentes similares.

Que el sitio del accidente estaba desprovisto de vallas, verjas, avisos, rótulos, para indicar aguas profundas; y además para indicar el peligro consistente en la proximidad de la carretera al lago.

Que el día del accidente el referido lago estaba lleno a capacidad, y que el mismo era y es profundo.

Que el riesgo envuelto, en cuanto a la profundidad del agua, no era perceptible aún para personas adultas, debido a que la oscuridad de dicho cuerpo de agua impedía conocer la profundidad de las mismas.

Que el terreno que bordea al lago, en el sitio del accidente, es blando y cede con facilidad debido a la erosión natural."

Como cuestión de derecho determinó el tribunal que:

"[a] En el sitio preciso del lago, donde pereció ahogado el menor Ángel Ildefonso López Santiago, y debido a la proximidad de dicho lago a la carretera Estatal 184, la codemandada, Autoridad de las Fuentes Fluviales de Puerto Rico, debió haber cercado, o mantenido vigilancia, para evitar accidentes como el

de autos, considerando que la extensión del lugar donde el lago bordea la carretera, a corta distancia, es de apenas cincuenta pies a lo largo de la misma y el costo de protegerlo no hubiera sido oneroso.

"[b] ... dicho sitio era transgredido por menores y que anteriormente habían ocurrido accidentes similares en este lago, justifican, a base de las circunstancias concurrentes en el caso que nos ocupa, que nos apartemos de la doctrina establecida por nuestro más alto Tribunal en el caso de *Cayetano c/p Santana Vargas Rodríguez, etc.* vs. *Autoridad de las Fuentes Fluviales*, resuelto en 28 de septiembre de 1962. Véanse, además, *Banker* v. *McLaughlin*, 208 S.W.2d 843 y *Altenback* v. *Lehigh Valley R. Co.*, 37 A.2d 429."

Por último, concluyó el referido tribunal que debido al descuido e inadvertencia de los padres del menor fallecido la cuantía de los daños debe ser reducida en un 50% por lo que condenó a la recurrente a pagar a los recurridos la suma de $10,000 más $1,500 para costas, gastos y honorarios de abogado.

Apunta la recurrente que el tribunal incidió al determinar que ella fue negligente y al no aplicar como cuestión de hecho y de derecho el caso de *Vargas Rodríguez* v. *Fuentes Fluviales*, 86 D.P.R. 104 (1962).

Concluimos que tiene razón, por lo que debe revocarse la sentencia dictada por el tribunal de instancia en este caso y en su lugar dictarse otra desestimando la demanda.

Los hechos del caso, según el récord, se relacionan a continuación.

El día 22 de noviembre de 1962, que era un día feriado por ser la conmemoración del día de Acción de Gracias, dos familias de íntima amistad de la ciudad de Guayama, Puerto Rico, una de apellido Rovira y la otra de apellido López Morales, salieron a pasarse el día en la playa. Luego decidieron ir al Lago de Patillas para complacer a los menores en el grupo que querían pescar y porque les resultaba más conveniente. La familia Rovira tenía conocimiento del área del

accidente por haber pasado por allí con frecuencia.

El grupo se componía de cuatro adultos, o sea, dos parejas de matrimonio y cinco menores. El grupo procedió a estacionar el vehículo de motor en las inmediaciones de la carretera que bordea el tramo del lago, dejando parte de las ruedas sobre la brea, a una proximidad del lago de dos o tres pies. Allí empezaron a gozar del fresco y sombra de los árboles que ofrecía el lugar y luego almorzaron y mientras conversaban, oían las carreras de caballos y música de un radio.

A uno de los menores, hijo de los esposos Rovira, de ocho años, o sea, un año mayor que Kelly, el niño que tuvo el desgraciado accidente, se le concedió permiso para irse a pescar al lago. Este menor, en unión de otro menor un poco mayor que él, de nombre Frankie Ortiz, sobrino de los recurridos, de catorce años de edad, se fueron a pescar en las inmediaciones del lago y se apartaron del grupo como a una distancia de ciento veinticinco pies a ciento cincuenta pies. A Kelly, quien tenía siete años, no se le dio permiso por ser menor, a pesar que tenía un año menos que el otro menor, Luis Antonio Rovira, a quien se le dio permiso para ir a pescar.

La señora de Rovira testificó que presumía que la curiosidad hizo que Kelly se fuese tras su hijo Luis Antonio para observarlo mientras pescaba; que los mayores no se dieron cuenta de que se había ido del grupo aunque todos "estábamos pendientes del hijo mío y el sobrino de él [López Morales] que estaban trepados en una piedra pescando."

El padre de Kelly testificó que los niños Rovira y Ortiz "Estaban tirando un anzuelo a una distancia de 100 pies . . . . En una piedra . . . ." que da al lago; que hacia allá se dirigió Kelly caminando "Fuera del pavimento por la arenita . . . . El siguió y entonces yo lo veía y entonces después llamó de allá Luis Antonio Rovira; 'Kelly se fue al agua' y yo corrí y cuando llegué me tiré al agua . . . un poquito antes de llegar a la roca . . . porque . . . la desesperación es tan grande que

no llegué al sitio y me tiré un poquito más acá, no distante de la roca . . . ."

El interrogatorio del niño Luis Antonio Rovira, amiguito íntimo del niño fenecido fue, en la parte pertinente al accidente, el siguiente:

LCDO. DÍAZ LAMOUTTE:

Explica al Tribunal que fue lo que pasó que Kelly sufriera ese accidente.

TESTIGO:

Bueno, después que nosotros y Frankie López nos fuéramos a pescar a la piedra en el Lago de Patillas él se nos vino detrás y Frankie le dijo que volviera a donde estaba todo el mundo a la orilla del lago y él se fue y Frankie y yo nos fuimos para la piedra y estuvimos allí cinco minutos y él volvió y al volver le dijimos . . .

¿Cuántas veces había ido a la piedra?

Esa era la primera vez que venía a la piedra después que había vuelto.

¿Qué le dijeron ustedes?

Que volviera.

¿Y qué pasó?

Seguimos pescando y no nos dimos cuenta si se fue; yo sé que él llegó donde estaba todo el mundo y se quedó dando vuelta.

¿Y regresó?

Sí, señor.

¿A dónde estabas tú?

Sí, señor.

¿En la piedra?

Sí, señor.

¿Y qué pasó?

TESTIGO:

*Entonces él bajó con nostros* . . .

LCDO. DÍAZ LAMOUTTE:

¿Bajó a dónde?

*A la piedra.* Entonces Frankie estaba acostado en la piedra con unos potes tratando de coger los peces y yo detrás de él y *Kelly se paró detrás de mí y le dije: 'agárrate de las bambúas'* y pasaron dos minutos, y seguimos pescando sin ponerle atención y *en eso él resbaló de la piedra y se cayó.*

¿De la misma piedra donde estaban parados?

Sí, señor.

¿Cuántas veces había ido a esa piedra antes de esa ocasión?

El no llegaba a la piedra.

¿Pero cuando se cayó estaba en la piedra?

Sí, señor.

¿La piedra queda cerca o lejos de la carretera?

¿De la brea?

Sí.

Aquí está la carretera y como de aquí a la ventana, más o menos.

.    :    .    .    .    .    .    .

HON JUEZ:

Veinte a veinticinco pies.

.    .    .    .    .    .    .    .

LCDO. GIMÉNEZ:

¿Dónde tú compraste el hilo y la carnada para ir a pescar?

TESTIGO:

Papi me lo compró cuando íbamos por el camino.

¿Cuando iban por el camino hacia el lagó?

Sí, señor.

¿Lo compró porque se lo pediste o por qué?

Yo se lo pedí.

¿Entonces tú querías ir a pescar allí?

Sí señor.

¿Le compraron uno a Frankie?

Sí, señor.

¿Tan pronto llegaron empazaron a pescar o estuvieron un rato jugando?

Estuvimos un rato jugando al lado de nuestros papás y de los carros.

¿Entonces los únicos que estaban pescando eran tú y Frankie?

Sí, señor.

¿A los demás no los dejaron ir, los papás no los dejaron ir?

Ajá.

¿La piedra es grande o pequeña?

Según yo recuerdo era una piedra grande.

¿Sobresalía del agua?

Sobresalía.

¿Por debajo del agua había más piedra que se proyectaba?

No puedo decir.

LCDO. GIMÉNEZ:

¿Esa misma piedra había parte por debajo del agua?

TESTIGO:

No sé.

¿Tú sabes qué es musgo?

*Limo.*

¿Una cosa verde?

Limo.

*¿Tenía?*

*Yo creo que no.*

¿Resbalaba?

*No podría recordar.*

Sin embargo, se estaban agarrando.

Sí, porque Frankie estaba acostado en la piedra, y yo agarrando a Frankie . . .

¿Y detrás de ti estaba Kelly?

*Eso fue cuando vino la vez . . .*

¿Cuándo ocurrió la cosa?

Sí.

¿Frankie estaba en el piso acostado, tú agarrando a Frankie y *Kelly detrás de ti?*

*Sí, señor.*

¿Cuando de momento tú oyes que cae al agua?

Sí.

¿Así pasó?

Sí." (Énfasis nuestro.)

Tanto el Sr. López Morales como el testigo Juan Vázquez trataron infructuosamente de recobrar el cuerpo del niño hasta tarde en la noche. Lo recobró un buzo en la mañana siguiente.

Juan Vázquez testificó que vive a dos hectómetros del Lago de Patillas; que trató de recobrar el cuerpo de Kelly zambullendo en el sitio que le indicaba la señora de Rovira. Su interrogatorio continuó así:

TESTIGO:

El lago de la carretera queda un promedio, cuando está lleno, como aquella vez, aproximadamente dos pies y medio.

LCDO. GIMÉNEZ:

¿Ahí fue que apareció el níño?

Sí, señor.

¿Cómo es el terreno después del pavimento de la carretera?

Después del pavimento el terreno usted se para y fácilmente usted se va.

¿Cede el terreno?

Sí, señor, porque es blando en ese pedazo.

¿Cómo son las aguas?

Ondas.

¿Son claras, cristalinas?

Obscuras.

¿En esa parte donde dice que la carretera quedaba a apenas dos pies, hay algún otro lugar que quede a dos pies?

Sí, señor, también acá la orilla del Lago, de la Pared para allá otro pedazo, aproximadamente cincuenta o cien pies.

.    .    .    .    .    .    .    .

¿Cuando usted frecuente al pueblo de Patillas, necesariamente tiene que viajar por esa carretera?

Sí, señor.

¿En sus viajes por allí usted ha visto niños en el lago?

Sí, señor, he visto.

¿Haciendo qué?

Van a almorzar en la orilla del lago.

¿Qué otra cosa hacen allí?

Hay veces que van muchachos del barrio a pescar.

LCDO. GIMÉNEZ:

¿Van a pescar?

TESTIGO:

Sí señor.

¿Usted diría que eso lo hacen una vez al año?

No . . .

¿Todos los días?

No todos los días, pero . . .

¿Con frecuencia?

Sí, señor.

¿Sabe si alguna persona se ha ahogado ahí?

.    .    .    .    .    .    .    .

TESTIGO:

Yo del mismo lago he rescatado dos personas y traté de res-

catar otro que no pude; rescaté a Carlitos García y al menor nieto de Carmelo Pagán, y más arriba hace poco se rescató a otro.

¿Alguno murió?

Todos.

¿Todos murieron?

Sí, señor.

¿Qué hacían allí?

El difunto Carlitos se tiró a un bote y no tuvo aquel de llegar al bote.

¿Y la otra persona?

Un nene que se resbaló.

Lcdo. Giménez:

¿De dónde?

Testigo:

En la otra orilla, en la otra carretera de Marín.

¿De las cercanías del lago?

Sí, señor, igual que este niño.

¿Y el tercero?

Domingo Bernier.

¿Qué hacía,

Bañándose.

¿Usted dice que veía niños allí?

Sí, señor.

¿Haciendo qué?

Pasan por allí por la carretera.

¿Qué hacían?

A pescar.

¿Nadaban allí?

Sí, señor.

¿Usted vio en momento alguno algún rótulo o aviso significando el peligro de aquello?

Nunca.

¿Algún rótulo significando la profundidad?

No, señor.

¿Alguna verja?

Tampoco.

Lcdo. Giménez:

¿Algún celador o guardián?

Testigo:
No, señor.
¿En el lugar donde se rescató ese niño habían esas cosas?
No, señor.

Testificó Vázquez, además, que el Lago de Patillas es grande, que "creo que pasa de 300 a 400 cuerdas". Más tarde testificó que *"acá en la orilla del lago, usted se para y fácilmente cae al agua"* porque el terreno es fofo cuando está mojado. (Énfasis nuestro.) No hubo prueba de que el terreno estuviese seco o mojado. Del hecho de que las dos familias se pasaron el día junto al lago a la intemperie se puede inferir que ese día no llovió allí. Dijo que el niño se encontró a una profundidad de 50 pies.

De entrada es necesario advertir que los casos de *Banker*, supra, y *Altenbach*, supra, en los que descansa la determinación de responsabilidad impuesta por el tribunal de instancia a la recurrente, son claramente distinguibles del que nos ocupa. En el primero se trataba de una excavación en una calle como en *Murcelo* v. *H. I. Hettinger & Co.*, 92 D.P.R. 411 (1965). En *Altenbach*, supra, se trataba de un embalse construido por una compañía ferroviaria en un área residencial con el fin de proveerse de protección contra fuegos y de un suministro de agua para sus necesidades. A dicho embalse afluían niños a jugar por muchos años, conocimiento de lo cual era atribuible a dicha compañía. Se justificó imponerle responsabilidad por la muerte por inmersión de un niño en dicho embalse bajo la doctrina de peligro atrayente. En *Saxton* v. *Plum Orchards*, 40 So.2d 791 (La. 1949), se trataba de una piscina en una residencia en la cual se ahogó una niña de 4 años hija de un vecino. Se impuso responsabilidad bajo la doctrina de peligro atrayente. Estos dos casos no reflejan el sentir de la mayoría de los tribunales sobre la cuestión.

Por el contrario, en el caso ante nos el niño fallecido tenía ocho años de edad. Estaba bajo la supervisión de su

padre quien lo vio y lo dejó alejarse del grupo familiar y dirigirse a la roca desde donde pescaban otros dos niños mayores que él. El lago de Patillas es un cuerpo de agua de unas 300 a 400 cuerdas de extensión, construido como parte del sistema de riego e hidroeléctrico de la costa sur de Puerto Rico. Está localizado en una zona rural apartado de las áreas residenciales de los pueblos más cercanos. Por su uso y dedicación no es distinto al canal de riego que ocupó nuestra atención en *Vargas Rodríguez* v. *Fuentes Fluviales*, 86 D.P.R. 104 (1962), y en *Reyes Aponte y Vega Muñoz* v. *Fuentes Fluviales*, Sentencia de 17 de marzo de 1970. Del récord no aparece que adoleciera de peligros poco usuales o de trampas, ocultos o encubiertos. No se estableció que el día del accidente el terreno entre la carretera y el lago estuviese blando y cediese. Lo único que la prueba demuestra es que esa condición existe cuando está mojado. Por el contrario, la prueba indica que esa condición no fue la causa de la caída del niño al lago sino que el niño se cayó de la piedra donde pescaban otros dos niños. Tampoco se estableció que alguna persona de mayor peso que el niño resbalara o se cayera en ese sitio durante su desesperado ir y venir por allí con motivo del trágico accidente.

■ Como indicamos en *Vargas*, supra, la doctrina de peligro atrayente no es de aplicación a cuerpos de agua como los canales de riego. Los mismos fundamentos sirven para concluir que tampoco aplica a lagos como el de Patillas en ausencia de peligros poco usuales o trampas, ocultos o encubiertos. Así se ha resuelto en la mayoría de las jurisdicciones en los Estados Unidos. *Switzer* v. *Dye*, 177 So.2d 539 (Fla. 1965); *Alabama Great Southern R. Co.* v. *Green*, 159 So.2d 823 (Ala. 1964).

En *Fickling* v. *City Council of Augusta*, 138 S.E.2d 437 (Ga. App. 1964), se dijo que un municipio no es responsable por la muerte de un niño de nueve años que se ahogó en una laguna de 15 cuerdas creada por la extracción de grava

y arena en área residencial y a donde por 20 años acudían niños a jugar y donde no había señales o aviso de peligro.

En *Hanners* v. *City of Ashland,* 331 S.W.2d 729 (Ky. 1960), se determinó que la doctrina de peligro atrayente no aplica en el caso de un niño de 7 años que se ahogó mientras nadaba en un embalse construido de concreto a donde concurrían niños y adultos a bañarse durante los veranos. Dicho embalse no tenía ningún dispositivo protector en su alrededor excepto una verja de alambres de púas. Dijo el tribunal que la referida doctrina no era de aplicación porque (1) tales lugares no crean una condición de peligro especial no natural u oculto; (2) el posible peligro es generalmente reconocible aun por niños de tierna edad; (3) es prácticamente imposible proteger adecuadamente estos sitios de su invasión por niños aventureros excepto a un costo enteramente desproporcionado en relación con el riesgo envuelto.

En *Jones* v. *Comer,* 374 N.W.2d 465 (Ark. 1964), dos niños de 9 años y uno de 8 se ahogaron en una laguna de 150 pies de largo por 100 de ancho y 15 de profundidad que había sido usada como parte de un campo de golfo en la cual había un viejo bote cerca de un árbol con un cable o soga colgante que éstos y otros niños usaban para mecerse, jugar y nadar. Se concedió sentencia sumaria porque "El peso de las autoridades en el país es al efecto que las lagunas, lagos, ríos, embalses y otros cuerpos de agua, no constituyen un peligro atrayente en ausencia de un elemento extraordinario de peligro."

En *Wilford* v. *Little,* 301 P.2d 282 (Cal. App. 1964), un niño de 4 años y medio se ahogó al caerse del trampolín en una piscina en la propiedad del demandado a donde concurrían niños del vecindario. Se alegó que la piscina estaba construida en tal forma que era difícil para un niño sujetarse de los lados de la misma y que el niño era demasiado joven para darse cuenta del peligro. La propiedad del demandado donde radicaba la piscina no estaba cercada. Pudo cer-

carse a poco costo. La piscina era visible al vecindario. Al desestimar la demanda mediante excepción previa, dijo el tribunal que la piscina no constituía un peligro atrayente; que "La presencia de peligro para un niño desatendido es sólo prueba de la necesidad de la atención que le deben sus padres. Un niño no le tiene miedo a nada y está en peligro cuando se deja por su cuenta. El deber primario de cuidarlo recae sobre sus padres. Su negligencia no convierte una situación peligrosa para un niño en un peligro atrayente que no sería tal para niños mayores."

En *Anneker* v. *Quinn-Robbins Co.*, 323 P.2d 1073 (Idaho 1958), se dijo que las orillas empinadas, escarpadas, lisas y resbaladizas de un embalse o río no constituyen un peligro oculto cuando tal condición es natural, visible y fácilmente aparente. En este caso se desestimó una demanda de daños y perjuicios por la muerte de un niño de tres años ocurrida cuando al escaparse de la atención de su madre, fue atraído hacia un extremo de los terrenos de una escuela cerca de la orilla de un pantano que formaba parte de una laguna que se creó al abandonarse un cascajal de la demandada donde la orilla, que era empinada cedió, cayendo el niño al agua en la que se ahogó. Véanse, *Bass* v. *Quinn-Robbins Co.*, 216 P.2d 944 (Idaho 1950). 36 A.L.R. 225.

*En vista de lo expuesto, debe revocarse la sentencia dictada en este caso por el tribunal de instancia y dictarse otra desestimando la demanda.*

El Señor Juez Presidente no intervino. Los Jueces Asociados Señores Hernández Matos y Santana Becerra disintieron sin opinión.