El Juez Asociado Señor Estrella Martínez
emitió la opinión del Tribunal.
El recurso de autos nos permite determinar, por pri-mera vez, cuáles son los terrenos que componen el Corre-dor Ecológico de San Juan según designados por la Ley Núm. 206-2003 (12 L.P.R.A. see. 216 et seq.), según enmen-dada por la Ley Núm. 260-2004 y la Ley Núm. 1-2007.
Al así hacerlo, debemos evaluar si el Tribunal de Apela-ciones erró al revocar el desarrollo preliminar y antepro-yecto de construcción aprobado por la Administración de Reglamentos y Permisos (A.R.Pe.), pues interpretó que a la totalidad de los terrenos privados, aledaños a las franjas protegidas por ley, les aplica una prohibición absoluta de desarrollo.
*1038 r — I
Los hechos que dan lugar a la controversia de autos se remontan al 14 de junio de 2007, cuando la Junta de Pla-nificación aprobó una consulta de ubicación para el desa-rrollo extenso de un proyecto residencial, denominado Ciu-dad Jardín de Cupey, que fue presentada por Empresas Loyola I, S. en C. (Empresas Loyola). El proyecto consiste de la construcción de 624 apartamentos distribuidos en 14 edificios de 5 plantas y 8 edificios de 6 plantas, áreas de estacionamiento y vecinales en una finca ubicada en el barrio Caimito de San Juan. La resolución para aprobar la consulta de ubicación no se revisó, por lo que advino final y firme. Tampoco se impugnó en el recurso de epígrafe.
En lo pertinente, al evaluar el proyecto se consideró que la finca se encuentra entre dos cuerpos de agua: el Río Piedras y la Quebrada Las Curias. El proyecto contó con el endoso del municipio de San Juan y de varias agencias, entre las que se destacan el Departamento de Recursos Naturales (D.R.N.A.) y la Junta de Calidad Ambiental. Es-tas últimas requirieron que se dedicara a uso público una faja de terreno paralela al río y a la quebrada. Como con-secuencia, en la consulta de ubicación se ordenó a Empre-sas Loyola que cumpliera con los requisitos indicados por el D.R.N.A. para que se dedicaran 20 metros a una franja de terreno entre los cauces de los cuerpos de agua y el proyecto.
Como parte de las subsiguientes etapas, Empresas Loyola presentó ante A.R.Pe. su solicitud de desarrollo preli-minar y anteproyecto de construcción para la consulta de ubicación aprobada por que la Junta de Planificación. A.R.Pe. certificó la petición mediante una resolución emi-tida el 13 de agosto de 2008, y concluyó que el desarrollo preliminar y anteproyecto cumple con los parámetros apro-bados por la Junta de Planificación en la consulta de ubicación. Además, A.R.Pe. determinó que el desarrollo fo- *1039 menta la conservación de las áreas verdes arboladas exis-tentes a lo largo de las riveras del Río Piedras y de la Quebrada Las Curias.
Con relación a la protección de los cuerpos de agua, A.R.Pe. consideró que los terrenos del proyecto colindan con el Río Piedras y con la Quebrada Las Curias; en la porción sureste se localizan dos depresiones con flujo inter-mitente que nacen en el predio y que son tributarias a la quebrada, los cuales se mantendrán inalterados. A su vez, examinó que el desarrollo propuesto incluye, según reque-rido por el D.R.N.A., mantener intacta una franja de te-rreno con un ancho mínimo de 20 metros a lo largo del río y de la quebrada. De esta forma, concluyó que se preserva totalmente la vegetación existente en los márgenes de esos cuerpos y se protegen los cauces de los ríos implantando medidas de prevención de erosión y sedimentación.(1)
Inconformes, la Comisión de Ciudadanos al Rescate de Caimito, Montehiedra Community Association, Inc. y el Comité de Vecinos de Calle Bienteveo, Sector Guayacán, Montehiedra (los recurridos) presentaron una moción de reconsideración ante A.R.Pe. Sostuvieron que el proyecto impactaría adversamente el Corredor Ecológico de San Juan, el Río Piedras y la Quebrada Las Curias, cuyos már-genes forman parte del Arboretum de Cupey (Arboretum). Aludieron que la resolución de A.R.Pe. es contraria a la Ley Núm. 206, supra. El 24 de septiembre de 2008 A.R.Pe. declaró “no ha lugar” la solicitud de reconsideración.
Ante tal situación, y en desacuerdo con ésta, los recurri-dos acudieron al Tribunal de Apelaciones. Señalaron como único error que A.R.Pe. autorizó el desarrollo preliminar y anteproyecto de construcción contrario a las disposiciones de la Ley Núm. 206, supra, que establece el Corredor Eco-lógico de San Juan al cual se incorporó el Arboretum.
*1040 El Tribunal de Apelaciones revocó a A.R.Pe. mediante una Sentencia de 29 de jimio de 2009. Luego de analizar la Ley Núm. 206, supra, el foro intermedio concluyó que el propósito de ésta es proteger los recursos naturales en ar-monía con un desarrollo ecológicamente sostenible que proteja la cubierta verde y las cuencas de las quebradas. Indicó que el estatuto es claro con los lindes que compren-den el Arboretum y el Corredor Ecológico de San Juan, y con lo referente a la suspensión absoluta de la emisión de permisos que atenten contra la política pública enmarcada al aprobar la ley. El foro apelativo intermedio concluyó que los márgenes del Río Piedras y de la Quebrada Las Curias son parte del Corredor Ecológico de San Juan. Por lo tanto, aclaró que la Ley Núm. 206, supra, aplica a la solicitud de aprobación del anteproyecto que presentó Empresas Loyola. Determinó que “ [evidentemente este tipo de pro-yectos fueron los que motivaron la creación de la Ley del Corredor Ecológico de San Juan para conservar precisa-mente sus cuerpos de agua, flora y fauna. Se trata de un desarrollo extenso que se pretende construir en el área que el legislador protegió, tras haberse aprobado la Ley 206, que establece el Corredor Ecológico, supra”. Sentencia del Tribunal de Apelaciones, pág. 15, Apéndice de la Petición de certiorari, pág. 66.
En desacuerdo con la sentencia del Tribunal de Apela-ciones, Empresas Loyola comparece ante este Tribunal y señala los errores siguientes:
PRIMERO: Erró el Tribunal de Apelaciones al aplicar a la finca de la peticionaria la prohibición absoluta de desarrollo establecida por la Ley Núm. 206 (que crea el Corredor Ecoló-gico de San Juan), según enmendada, por la Ley Núm. 260 (que incorpora el Arboretum de Cupey a dicho Corredor), cuando del propio texto de la ley invocada surge que dicha finca no se encuentra incluida entre aquellas para las cuales se legisló tal prohibición.
SEGUNDO: Erró el Tribunal de Apelaciones al determinar que la autorización del desarrollo preliminar y anteproyecto de construcción conferida por la ARPe a la peticionaria, bajo el *1041 número de caso 08DA2CET00-04605, como parte del proceso de permisología seguido para el desarrollo del proyecto Ciudad Jardín de Cupey, resulta contraria e inconsistente con los es-tatutos que administra dicha agencia y sus propias políticas públicas.
TERCERO: Erró el Tribunal de Apelaciones al ignorar el es-tándar deferencial que rige en materia de revisión judicial de decisiones administrativas y así sustituir de manera arbitra-ria el criterio experto y altamente especializado de la Junta de Planificación y la ARPe por el suyo propio. Sin mediar para ello causa o justificación alguna, de hecho o de derecho. Peti-ción de certiorari, págs. 17-18.
En reconsideración, el 5 de abril de 2010 este Tribunal expidió el recurso. Con el beneficio de la comparecencia de las partes, procedemos a resolver los errores señalados.
II
A. Revisión judicial de decisiones administrativas
Debemos recordar la norma firmemente establecida de que las decisiones de los foros administrativos están revestidas de una presunción de regularidad y corrección. Las conclusiones de estas agencias merecen gran deferencia por parte de los tribunales, por lo que debemos ser cuidadosos al intervenir con las determinaciones administrativas. Este principio de deferencia responde a la realidad de que los organismos administrativos poseen la experiencia y los conocimientos altamente especializados que aplican dentro del ámbito de sus facultades y responsabilidades. Unlimited v. Mun. de Guaynabo, 183 D.P.R. 947 (2011); Mun. de San Juan v. CRIM, 178 D.P.R. 163, 175—176 (2010); Borschow Hosp. v. Jta. de Planificación, 177 D.P.R. 545, 566 (2009); Hatillo Cash & Carry v. A.R.Pe., 173 D.P.R. 934, 954 (2008); Rivera Concepción v. A.R.Pe., 152 D.P.R. 116,122-124 (2000); Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 672-673 (1997).
Por estos preceptos hemos advertido que el criterio de razonabilidad es el que impera al revisar las deter- *1042 minaciones e interpretaciones de una agencia adminis-trativa. Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77—78 (2004). La función de este Tribunal al revisar las decisiones de los organismos administrativos se debe limitar a determinar si la agencia actuó arbitraria o ilegalmente, o de una forma tan irrazonable que constituye un abuso de discreción. En cuanto a las determinaciones de hechos, debemos abste-nernos de intervenir con éstas si se sostienen con evidencia sustancial que surge del expediente. Id.; Pereira Suárez v. Jta. Dir. Cond., 182 D.P.R. 485, 511-513 (2011); Fuertes y otros v. A.R.Pe., 134 D.P.R. 947, 953 (1993); Murphy Bernabe v. Tribunal Superior, 103 D.P.R. 692, 699—700 (1975).
Una determinación de hecho realizada por una agencia administrativa se revisará cuando quien la impugna demuestre que existe otra prueba en el expediente que reduce o menoscaba el valor probatorio a tal grado que no se puede concluir que la agencia actuó razonablemente. Véanse: Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905-907 (1999); Metropolitana S.E. v. A.R.Pe., 138 D.P.R. 200, 212-213 (1995). Por otra parte, las conclusiones de derecho de la agencia se revisarán en todos sus aspectos aunque estén salvaguardadas por la norma de deferencia sustancial a las interpretaciones que en derecho haga la agencia, por lo que no podemos descartarlas livianamente. En estos casos se debe distinguir entre los asuntos de interpretación estatutaria —en lo que los tribunales son los especialistas— y aquellas situaciones propias de la discreción o pericia administrativa. En este último aspecto, hemos expresado que cuando se trata de “política pública altamente técnica es que se determina que las agencias se encuentran mejor equipadas para hacer la decisión que interpreta la ley”. D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed. rev., Bogotá, Ed. Forum, 2001, pág. 560. Véanse, además: See. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. see. *1043 2175; Pagán Santiago et al. v. ASR, 185 D.P.R. 341 (2012); Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923, 940 (2010); Martínez v. Rosado, 165 D.P.R. 582, 589—590 (2005); Rebollo v. Yiyi Motors, supra, pág. 78; Mun. de San Juan v. J.C.A. [I], 149 D.P.R. 263, 279-280 (1999).
Estas son las normas de revisión que imperan en nuestro ordenamiento administrativo. Debemos añadir que en Puerto Rico la normativa jurídica sobre los recursos naturales y el medio ambiente posee una dimensión de or-den constitucional. El Art. VI, Sec. 19 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 2008, pág. 440, dispone que “[s]erá política pública del Estado Libre Asociado la más eficaz conservación de los recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...”.
El mandato para el Gobierno es claro y está recogido en el informe de la Comisión que redactó la disposición constitucional. J. Trías Monge, Historia constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 235. El informe señala como sigue:
Es nuestro propósito señalar con absoluta claridad la conve-niencia y necesidad de que se conserven los recursos naturales en Puerto Rico. Siendo Puerto Rico una isla y teniendo pocos recursos naturales, debe haber una preocupación constante por parte del Estado en el uso, desarrollo, aprovechamiento y conservación de los mismos. La conservación de la tierra, los bosques, los peces, las aguas, las aves, las minas y las salinas, entre otros, debe ser una de las funciones primordiales de nuestro Gobierno.
El Estado debe estudiar, y controlar hasta donde ello fuere posible, el desarrollo de sus recursos naturales. Entendemos por “conservar”, el estudio y control de los recursos para evitar la dilapidación de los mismos.
El concepto “conservar” conlleva, además, la facultad de la Asamblea Legislativa para suspender o abolir la caza o la pesca y controlar, cuando lo estime necesario y conveniente, la explotación y desarrollo de otros recursos naturales que exis-ten actualmente o surjan en el futuro. 4 Diario de Sesiones de la Convención Constituyente 2622 (1952).
*1044 Como consecuencia, hemos expresado que cualquier decisión o determinación del Estado que incida sobre los recursos naturales debe responder cabalmente al doble mandato contenido en nuestra Constitución, este es, lograr la más eficaz conservación de los recursos naturales y procurar el mayor desarrollo y aprovechamiento de esos recursos para el beneficio general de la comunidad. Este constituye el criterio jurídico primordial al juzgar la validez o interpretar el significado de cualquier norma o decisión relacionada con el uso o la protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental. Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 918-920 (1998). Corresponde a los tribunales la función de asegurar que el Gobierno o sus agencias cumplan con la obligación de examinar cuidadosamente las implicaciones de los proyectos a desarrollarse. De esta forma, garantizamos el cumplimiento de las leyes y contribuimos para que en la consecución del progreso no queden maltrechos los valores de igual jerarquía e importancia.
Claro está, el uso eficiente y la conservación de los re-cursos no constituyen ni podrán configurar un impedi-mento absoluto para el desarrollo, sino que su uso más eficiente debe siempre ser observado de forma balanceada. Véanse: Mun. de San Juan v. J.C.A. [II], 152 D.P.R. 673, 700 (2000); Misión Ind. P.R. v. J.P. y A.A.A., supra, págs. 675-676 y 689; Paoli Méndez v. Rodríguez, 138 D.P.R. 449, 460-462 (1995).
B. La Junta de Planificación y A.R.Pe.
Entre las agencias administrativas a las que les aplica el estándar de revisión expuesto se encuentran la Junta de Planificación y A.R.Pe.(2)
*1045 La Junta de Planificación fue creada por la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. see. 62 et seq.). Su objetivo principal fue guiar el desarrollo integral y coordinado de Puerto Rico. 23 L.P.R.A. sec. 62c. En dicha función, debía velar por la adecuada utilización de nuestros terrenos y recursos naturales. Unlimited v. Mun. de Guaynabo, supra; Mun. de San Juan v. J.C.A. [II], supra, pág. 700; Asoc. Res. Park Side, Inc. v. J.P., 147 D.P.R. 277, 284 (1998); Arenas Procesadas, Inc. v. E.L.A., 132 D.P.R. 593, 608 (1993).
Para hacer viable esa función, la Junta de Planificación poseía amplios poderes para clasificar y designar los terre-nos en zonas y distritos, así como para establecer las nor-mas que guiaban su uso y desarrollo. De igual forma, la Junta de Planificación podía dispensar el cumplimiento de uno o varios requisitos reglamentarios para lograr la utili-zación óptima de los terrenos, encaminando un desarrollo urbano compacto. 23 L.P.R.A. sec. 62j(7).
En el caso de autos, la Junta de Planificación aprobó una consulta de ubicación para un desarrollo extenso en los terrenos ante nuestra consideración. La consulta de ubicación era uno de los instrumentos que poseía la Junta de Planificación para desempeñar su poder de implantar la política de planificación y urbanismo. Borschow Hosp. v. Jta. de Planificación, supra, pág. 557. Mediante ésta, se autorizaba el uso particular de un terreno cuyo uso pro-puesto no era permitido ministerialmente por la reglamen-tación aplicable, pero que las disposiciones reglamentarias proveían para que fuera considerado. Véanse: T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 85 (1999); Mi-sión Ind. P.R. v. J.P., 146 D.P.R. 64, 117-118 (1998); See. 2.00 del Reglamento de Zonificación de Puerto Rico, *1046 Reglamento de Planificación Núm. 4, Reglamento Núm. 6211 de 5 de octubre de 2000.(3) Para ello, la Junta de Pla-nificación consideraba las disposiciones de su ley orgánica, de la Ley de Municipios Autónomos, del Plan de Desarrollo Integral, Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, de los Planes de Usos de Terre-nos, de Mapas de Zonificación, de Mapas de Zonas Suscep-tibles a Inundación, del Plan de Ordenación Territorial adoptado y del Reglamento de Zonificación, entre otros. Véanse: T-JAC, Inc. v. Caguas Centrum Limited, supra, págs. 85-86; Misión Ind. P.R. v. J.P., supra, págs. 119-120. Así, pues, una vez aprobada la consulta de ubicación, se consideraba vigente durante el periodo dispuesto por la Junta de Planificación para continuar con las etapas sub-siguientes o durante la vigencia de cualquier etapa subsi-guiente a la consulta de ubicación dada la aprobación. Ade-más, la consulta de ubicación constituía un elemento esencial en la toma de decisiones de otras agencias debido a que establecía los parámetros que A.R.Pe. debía seguir y considerar en las subsiguientes fases. Véanse: Hatillo Cash & Carry v. A.R.Pe., supra, pág. 950; Sec. 10.00 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 de 13 de octubre de 1999.
Por otra parte, la Asamblea Legislativa relevó a la Junta de Planificación de sus responsabilidades fiscaliza-doras operacionales para que ésta dedicara sus esfuerzos y recursos a la implantación de la política pública y las es-trategias concernientes al desarrollo físico, económico y so *1047 cial del país. Asoc. Vec. Urb. Huyke v. Bco. Santander, 157 D.P.R. 521, 550 (2002); Asoc., C.D. Octubre v. J.A.C.L., 116 D.P.R. 326, 331 (1985); Junta de Planificación v. J.A.C.L., 109 D.P.R. 210, 214 (1979); The Richards Group v. Junta de Planificación, 108 D.P.R. 23, 31—32 (1978). Con ese fin, la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 et seq.) (Ley de A.R.Pe.), creó a A.R.Pe. como una agencia central adscrita a la Junta de Planificación, cuyo propósito consistió en velar por el cumplimiento de las le-yes y los reglamentos, y llevar a cabo los asuntos que le correspondían. 23 L.P.R.A. sees. 71a y 71d(p); Hatillo Cash & Carry v. A.R.Pe., supra, pág. 946.
En esencia, la fase operacional de planificación es posterior a la aprobación del proyecto por la Junta de Planificación. La fase operacional se inicia con la presen-tación de una solicitud de desarrollo y conlleva revisar la viabilidad del proyecto en su fase de implantación. Es una etapa de índole especial técnica que persigue corroborar los detalles particulares del proyecto para que se adhieran a lo dispuesto en la resolución aprobada por la Junta de Planificación. Unlimited v. Mun. de Guaynabo, supra. Una de las etapas subsiguientes a la consulta de ubicación era la del anteproyecto y desarrollo preliminar. El antepro-yecto consistía en un proceso por el cual se representaban las etapas de desarrollo de un proyecto en la forma preli-minar de un plano de construcción de obras o estructuras preparado por un profesional autorizado. Con ello se obte-nía un permiso preliminar que aceleraba el trámite de ex-pedición para los permisos de construcción si cumplía con las leyes y los reglamentos aplicables. Mun. de San Juan v. J.C.A. [II], supra, pág. 712. Tanto el anteproyecto como el desarrollo preliminar eran los mecanismos que se usaban para concretar los detalles del desarrollo, y correspondía a A.R.Pe. examinarlos como parte de la fase operacional re-lacionada con la consulta de ubicación previamente *1048 aprobada.(4) Véanse: Art. 3 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62b(f); Art. 3 de la Ley de A.R.Pe., 23 L.P.R.A. sec. 71b(Z).
En lo que nos atañe, estamos ante un proceso relacio-nado con la fase operacional de una consulta de ubicación final y firme que fue debidamente aprobada por la Junta de Planificación. Los errores señalados por Empresas Loyola se limitan a la etapa de anteproyecto y desarrollo pre-liminar ante A.R.Pe., cuya aprobación fue revocada por el Tribunal de Apelaciones.
C. Las leyes que crean el Corredor Ecológico de San Juan e incorporan el Arboretum
Para dilucidar si el error se cometió, es necesario exa-minar la Ley Núm. 206, supra, en la que el foro intermedio fundamenta su curso decisorio. Procedemos a ello.
1. La Ley Núm. 206-2003
Como parte de los esfuerzos del Estado en promulgar legislación para reiterar su compromiso con la más eficaz conservación de sus recursos, se promulgó el P. del S. 403. Éste se convirtió en la Ley Núm. 206-2003, supra, la cual creó el Corredor Ecológico de San Juan.
El proyecto legislativo respondió a la necesidad de lidiar con el desarrollo urbano desenfrenado en la ciudad capita-lina y evitar la contaminación del medio ambiente. Para ello se designó un área verde de aproximadamente mil cuerdas con bosques que constituyen zonas naturales de amortiguamiento para el desarrollo urbano y que repre-sentan una fuente de refugio y alimento para la vida sil-vestre, y estabilizan la erosión y los niveles de agua de ríos y quebradas. Informe Conjunto de la Comisión Especial de *1049 Desarrollo de la Ciudad de la Capital, la Comisión de Agri-cultura, Recursos Naturales y Energía y la Comisión de Hacienda del Senado de Puerto Rico sobre el P. del S. 403 de 30 de mayo de 2002, 14ta Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 14.
Los terrenos identificados componen una compleja ma-deja de ecosistemas, cada una con su balance interno, e interconectados entre sí y con otros sistemas para el bene-ficio de toda la zona de San Juan. Además, la protección de estas áreas resulta afín con el plan para la protección de las cuencas hidrográficas(5) —específicamente la de Río Piedras— como parte de un compromiso programático del Gobierno. 2003 (Parte 1) Leyes de Puerto Rico 1016,1023-1024.
Estos terrenos se manejarían para cumplir con la polí-tica pública a implantarse para la conservación, el manejo y la protección de los recursos naturales en la zona metro-politana de San Juan. Así, se estableció una calificación y una clasificación de los suelos cónsonas con el Reglamento de Ordenación Territorial del Municipio de San Juan, Tomo III, de la Oficina de Planificación y Ordenación Territorial de 13 de marzo de 2003.(6) La elección de los te-rrenos no constituyó una enajenación total de éstos, sino más bien una limitación de su uso para recreación, educa- *1050 ción y utilización por el público general. Véase Informe Conjunto de las Comisiones de Recursos Naturales y Cali-dad Ambiental, y de Desarrollo del Municipio de San Juan de la Cámara de Representantes de Puerto Rico sobre el P. del S. 403 de 18 de noviembre de 2002, 14ta Asamblea Legislativa, 4ta Sesión Ordinaria, pág. 20.
El objetivo principal del proyecto consistió en proteger las áreas verdes designadas para que formaran el Corredor Ecológico de San Juan. Con ello se prohibió el otorga-miento de permisos de construcción en esa zona contrarios a la política pública esgrimida y se ordenó al D.R.N.A. que adquiriera los terrenos que comprenden las fincas identifi-cadas debidamente con su número de catastro, para lo cual se asignaron unos fondos. Informe Conjunto de las Comi-siones de Recursos Naturales y Calidad Ambiental, y de Desarrollo del Municipio de San Juan, supra, pág. 1; In-forme Conjunto de la Comisión Especial de Desarrollo de la Ciudad de la Capital, la Comisión de Agricultura, Recursos Naturales y Energía y la Comisión de Hacienda del Senado de Puerto Rico, supra, págs. 11 — 13. Véase, además, el Plan para establecer prioridad de adquisición en el Corredor Ecológico de San Juan del D.R.N.A., Negociado de Servicio Forestal, División de Investigación Forestal, mayo de 2008.
El P. del S. 403 fue objeto de varias vistas públicas y de una vista ocular. El proyecto contó con la participación de numerosos grupos en representación de distintos sectores. Predominó el consenso mayoritario de avalar la propuesta para conservar las áreas verdes que componen los terrenos identificados por entender que responde a la necesidad de velar y proteger el ecosistema y las pocas áreas verdes den-tro del municipio de San Juan. Otros presentaron sus pre-ocupaciones con relación a los problemas que conlleva ad-quirir los terrenos y la falta de estudios ambientales, sociales y económicos profundos.
En cuanto a los cuerpos de agua ubicados en esas áreas, el Dr. Ariel E. Lugo, Director del Servicio Forestal del De- *1051 partamento de Agricultura de Estados Unidos de América, recomendó que “los ríos y quebradas sean incorporados al Corredor Ecológico ya que de por sí son corredores ecológi-cos naturales y esenciales para el ciclo de agua de la ciudad y el funcionamiento ecológico de las áreas verdes”. A su vez, expresó su oposición a la canalización de los ríos y quebradas. De igual forma, el Sr. Alexis Molinaris Fores-tier, Director Ejecutivo de la Fundación Enrique Martí Coll, ecólogo de profesión y consultor de proyectos e inicia-tivas ambientales para entidades gubernamentales, orga-nizaciones sin fines de lucro y empresas socialmente res-ponsables, exhortó a “proteger los ríos y quebradas como corredores naturales y descontinuar la canalización como solución a los problemas de inundación”. Informe Conjunto de la Comisión Especial de Desarrollo de la Ciudad de la Capital, la Comisión de Agricultura, Recursos Naturales y Energía y la Comisión de Hacienda del Senado de Puerto Rico, supra, págs. 39-40.
Posteriormente, el P. del S. 403 se convirtió en la Ley Núm. 206-2003, supra. A estos efectos, el Art. 1 de la Ley Núm. 206, dispuso, en parte, como sigue:
Con el fin de implantar la política pública de conservación y manejo y protección de los recursos naturales en la zona me-tropolitana de San Juan, la Asamblea Legislativa de Puerto Rico reconoce que los bosques son un recurso natural y único, por su capacidad para conservar y restaurar el balance ecoló-gico del medio ambiente y, por tanto, designa las fincas men-cionadas en el [Art. 7 de esta ley, 12 L.P.R.A. sec. 216f,] como Corredor Ecológico de San Juan, área que incluye las siguien-tes: Bosque Estatal del Nuevo Milenio; Bosque Urbano Doña Inés María Mendoza Rivera de Muñoz Marín; y las fincas ad-juntas que conforman el área conocida como el “Parque del Este”, según descrito en el Plan Especial Territorial 4.2 del Plan de Ordenación Territorial del Municipio de San Juan; el conector de área verde que une elementos lineales de ríos, quebradas y estas áreas verdes entre sí y el Estuario de la Bahía de San Juan; el Complejo Universitario de la Universi-dad de Puerto Rico, conocido comúnmente como el Jardín Bo-tánico Norte y el Jardín Botánico Sur, en Río Piedras, que comprende las propiedades administradas por la Administra- *1052 ción Central de la Universidad de Puerto Rico y la Oficina del Presidente de la Universidad de Puerto Rico, la Estación Experimenta[1] Agrícola (RUM), el Servicio de Extensión Agrí-cola (RUM), los terrenos anteriormente administrados por la Administración de los Colegios Regionales de la UPR, el nuevo Centro de Cuidado Diurno, la Residencia Oficial del Presi-dente de la UPR, el Jardín Botánico Norte, el Jardín Botánico Sur, los terrenos de la Universidad de Puerto Rico arrendados al Servicio Forestal Federal (Instituto Internacional de Daso-nomía Tropical); y los terrenos de la Universidad de Puerto Rico arrendados al Fideicomiso de Conservación de Puerto Rico, y la propiedad de la Autoridad de Acueductos y Alcanta-rillados (AAA) que comprenden los terrenos que anterior-mente pertenecían a la Central San José. Estos terrenos del Complejo Universitario pasarán a conformar parte del Corre-dor Ecológico de San Juan, pero la Universidad de Puerto Rico continuará con la titularidad de los mismos. (Énfasis suplido). 12 L.P.R.A. see. 216.
Como consecuencia, los lindes del Corredor Ecológico de San Juan fueron identificados catastralmente en el Art. 7 de la Ley Núm. 206, supra, 12 L.P.R.A. sec. 216f. En cuanto a estos terrenos, se estableció una prohibición a la Junta de Planificación, a A.R.Pe. y a cualquier otra instrumentalidad para emitir permisos que no fueran cónsonos con la política pública de conservación y con la calificación y clasificación establecidas por el Plan de Ordenamiento Territorial del Municipio de San Juan. Véase Art. 3 de la Ley Núm. 206, supra, 12 L.P.R.A. see. 216b. Igualmente, las fincas identificadas no pueden transferirse o enajenarse para otros fines. Art. 5 de la Ley Núm. 206, supra, 12 L.P.R.A. sec. 216d. A pesar de la preocupación planteada para que se incorporaran los ríos y las quebradas al Corredor Ecológico de San Juan, el legislador se limitó a incluir exclusivamente las fincas identificadas mediante el número de catastro. Tampoco se impidió el desarrollo ordenado en las áreas aledañas al Corredor Ecológico de San Juan.
2. La Ley Núm. 260-2004
La Ley Núm. 206, supra, fue enmendada el 8 de *1053 septiembre de 2004 cuando se aprobó el P. del S. 2414, el cual se convirtió en la Ley Núm. 260, supra. Con esta en-mienda se incluyó al Arboretum como parte del Corredor Ecológico de San Juan. Éste es un proyecto que respondió a la iniciativa ciudadana de las comunidades de Cupey y Caimito, que promueve la siembra de los árboles en espa-cios verdes.(7) 2004 (Parte 2) Leyes de Puerto Rico 1980, 1982. Véase, además, L.E. Rodríguez Rivera, Hacia un de-sarrollo sostenible: análisis de legislación ambiental apro-bada durante los años naturales 2003 y 2004, 74 (Núm. 3) Rev. Jur. U.P.R. 909 (2005).
Durante el proceso de aprobación de la Ley Núm. 260, supra, el D.R.N.A. destacó, en su ponencia del 17 de fe-brero de 2004, que el P. del S. 2414 consideró ampliar el Corredor Ecológico de San Juan para proteger las franjas verdes, sembradas por la comunidad. El D.R.N.A. reco-mendó que no se cambiaran los límites del Corredor Ecoló-gico de San Juan para incluir esas franjas. Por su parte, la Comisión Especial de Desarrollo de la Ciudad Capital y de Agricultura, Recursos Naturales y Energía, recomendó el P. del S. 2414 por entender que contempla la creación de un museo vivo de árboles. Véase Informe Positivo Final sobre P. del S. 2414 del Senado de Puerto Rico, 28 de abril de 2004, 14ta Asamblea Ordinaria, 7ma Sesión Ordinaria, págs. 10 — 11.
Conforme a lo señalado, al aprobarse la Ley Núm. 260, supra, el legislador expresó que el objetivo de esta ley era “detener la destrucción de estas áreas boscosas y proteger adecuadamente el único río existente y al único lago que tenemos en el Municipio de San Juan, como lo son el Río Piedras y el Lago Las Curias, al igual que quebradas tributarias”, por lo que dispuso “la inclusión del Arboretum Cupey dentro del Corredor Ecológico de San Juan para que se declare por ley la conservación de estas tierras y cuerpos *1054 de agua”. 2004 (Parte 2) Leyes de Puerto Rico 1982-1983. Así, al proteger las áreas verdes se evitaba el daño a las riberas aledañas.
Al aprobar la Ley Núm. 260, supra, el Corredor Ecológico de San Juan quedó configurado por el listado de fincas identificadas catastralmente. Se enmendaron el Art. 1 y el Art. 7 de la Ley Núm. 206, supra, 12 L.P.R.A. secs. 216 y 216f, respectivamente, para incluir el área sembrada de árboles denominada Arboretum. Para ello, se añadió al Art. 1 de la Ley Núm. 206, supra, los párrafos siguientes:
Se incluye en el Corredor Ecológico de San Juan, el área que comprende el Arboretum de Cupey, el cual, tomando como punto de partida el límite SUR OESTE del Jardín Botánico SUR y comenzando en las áreas verdes de la Avenida Ana G. Méndez (PR-176), transcurre hacia el SUR desde el puente sobre el Río Piedras entre el kilómetro 0.9 y el kilómetro 1.0 hacia las áreas verdes de los terrenos de la Avenida Víctor M. Labiosa, más adelante que comienza en el kilómetro 1.6 inclu-yéndose las áreas verdes en ambos lados y los remanentes de tierras pertenecientes al Estado Libre Asociado de Puerto Rico e incluyendo las áreas verdes de los terrenos que comprenden los márgenes de la Quebrada Ausubo a lo largo de la Avenida Víctor M. Labiosa hasta la intersección con la Avenida Las Cumbres (P.R. 199) al SUR.
Se incluyen los márgenes del Río Piedras desde que éste penetra en el Jardín Botánico Sur y en la colindancia con éste cerca del kilómetro 0.9-1.0 de la Avenida Ana G. Méndez, transcurriendo aguas arriba hacia el SUR, cruzando los puen-tes de las Avenidas Lomas Verdes (P.R. 177) y Las Cumbres (P.R. 199) hasta su nacimiento en la intersección de las Que-bradas Las Curias y Los Guanos.
Además, se incluyen los márgenes de la Quebrada las Curias y la Quebrada Los Guanos. (Enfasis suplido). 12 L.P.R.A. see. 216.
Las enmiendas al Art. 7 de la Ley Núm. 206, supra, para añadir los lindes, incluyeron la descripción del Arboretum, pero no se añadieron fincas por la designación ca-tastral, como se hizo originalmente. La razón para ello fue que al incluir el Arboretum solo se pretendía incluir las *1055 franjas de terreno que comprendían las áreas sembradas y los márgenes de los ríos y las quebradas en esos suelos. En ningún momento se pretendió incluir la totalidad de los terrenos adyacentes a éstas.
3. La Ley Núm. 1-2007
Lo señalado ocasionó una tercera enmienda a la Ley Núm. 206, supra. Para ello se presentó el P. de la C. 2701 con el fin de aclarar el lenguaje respecto a las áreas verdes aledañas a las vías públicas que componen el Corredor Ecológico de San Juan. Existía incertidumbre con relación a si los terrenos que componían el Arboretum —contenidos como parte del Corredor Ecológico de San Juan— incluían los terrenos públicos —como los márgenes de los ríos— o si comprendían, además, los terrenos privados. Véase Ponen-cia de la Junta de Planificación de 17 de febrero de 2004, en el P. de la C. 2701. Se cuestionaba si al incluir el Arboretum se abarcaron “las áreas verdes en terrenos públicos y en la servidumbre vial o si es cualquier área verde, in-cluyendo una finca privada que sucede que colinde en parte con la vía pública, que forme parte del ‘Arboretum’ ”. Informe de la Comisión de Desarrollo del Municipio de San Juan de la Cámara de Representantes sobre el P. de la C. 2701, 16 de octubre de 2006, 15ta Asamblea Legislativa, 4ta Sesión Ordinaria, pág. 3.
Mediante el P. de la C. 2701 se reiteró la política pública de “conservación y buen manejo de nuestros recursos na-turales y ambientales, en un necesario balance con la nece-sidad de nueva infraestructura y desarrollo ordenado”. Véase Informe de la Comisión de Comercio, Turismo, Ur-banismo e Infraestructura del Senado de Puerto Rico sobre el P. de la C. 2701, 9 de noviembre de 2006,15ta Asamblea Legislativa, 4ta Sesión Ordinaria. A su vez, se entendió necesario especificar que forman parte del Corredor Ecoló-gico de San Juan aquellas áreas verdes de la servidumbre legal a favor del Estado y el reglamentario de las vías públicas. Véase Informe de la Comisión de Desarrollo del *1056 Municipio de San Juan de la Cámara de Representantes sobre el R de la C. 2701, supra, págs. 3-4.
El 24 de enero de 2007, el R de la C. 2701 se convirtió en la Ley Núm. 1-2007. Mediante ésta, la Asamblea Legislativa aclaró cuáles terrenos, fincas y espacios públicos se incluyeron dentro del área del Corredor Ecológico de San Juan al aprobarse la Ley Núm. 260, supra. De esta forma, se minimizaron las diferencias de interpretación entre las agencias del gobierno y se cumplió con el sentido y espíritu que promulgó la designación del Corredor Ecológico de San Juan. Véase Exposición de Motivos de la Ley Núm. 1-2007.
De la Exposición de Motivos de la Ley Núm. 1, supra, surge indiscutiblemente que la intención legislativa al in-cluir el Arboretum al Corredor Ecológico de San Juan fue designar un área verde protegida a lo largo de éste para asegurar la protección de las “tierras públicas de sufrir impactos adicionales adversos”. Para ello, se añadió el Arboretum al Corredor Ecológico de San Juan para incluir un “área a las orillas de varias vías públicas y cuerpos de agua en que la comunidad ha desarrollado un proyecto de refo-restación urbana”. (Énfasis suplido). Estas áreas al mar-gen de las carreteras y cuerpos de agua hasta cierta dis-tancia constituyen servidumbre de uso público, por lo que la Asamblea Legislativa está facultada para restringir las actividades en esos espacios.
Ante tal aclaración, el Art. 1 y el Art. 7 de la Ley Núm. 206, supra, sufrieron una nueva enmienda. El segundo pá-rrafo del Art. 1 de la Ley Núm. 206, según enmendada por la Ley Núm. 260, supra, fue reformado por la Ley Núm. 1, supra, para que disponga como sigue:
Se incluye en el Corredor Ecológico de San Juan, el área que comprende el llamado “Arboretum de Cupey”, el cual, to-mando como punto de partida el límite SUR OESTE del Jar-dín Botánico SUR y comenzando en las áreas verdes de la Avenida Ana G. Méndez (PR-176), transcurre hacia el SUR *1057 desde el puente sobre el Río Piedras entre el kilómetro 0.9 y el kilómetro 1.0 hacia las áreas verdes de los terrenos de la Ave-nida Víctor M. Labiosa, más adelante que comienza en el ki-lómetro 1.6 incluyéndose las áreas verdes de la servidumbre legal y reglamentaria de dichas vías públicas así como los re-manentes de tierras pertenecientes al Estado Libre Asociado de Puerto Rico e incluyendo las áreas verdes de los terrenos que comprenden los márgenes de la Quebrada Ausubo a lo largo de la Avenida Víctor M. Labiosa hasta la intersección con la Avenida Las Cumbres (PR-199) al SUR. (Énfasis suplido). 12 L.P.R.A. see. 216.
En cuanto a la porción que constituye la servidumbre legal a los márgenes de los cuerpos de agua, ésta se en-cuentra delimitada por varias disposiciones aplicables. En lo pertinente a los hechos particulares, debemos destacar la Ley Núm. 49-2003, según enmendada por la Ley Núm. 55-2004 (12 L.P.R.A. see. 255 n.);(8) el Reglamento de Loti-ficación y Urbanización (Reglamento de Planificación Núm. 3), de 30 de junio de 2005, el Reglamento de Orde-nación Territorial del Municipio de San Juan, supra, y el Plan Especial Temático Núm. 8.
El Art. 2 de la Ley Núm. 49, supra, 12 L.P.R.A. sec. 255 n. dispone para que cualquier proyecto de urbanización, permiso de construcción o de uso, o cualquier lotificación en terrenos colindantes con o por el cual discurre un río, quebrada, laguna o cualquier cuerpo de agua, se dedique a uso público. Para ello, se requiere inscribir en el Registro de la Propiedad —a nombre del D.R.N.A. o del municipio con jurisdicción— una faja de terreno con un ancho mínimo de cinco metros lineales a ambos lados del cauce natural del río, arroyo o quebrada. De igual forma dispone la Sec. 14.00 del Reglamento de Planificación Núm. 3. Por su parte, en el municipio de San Juan, la See. 5.03(g) del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, requiere que se dedique a uso *1058 público a nombre del D.R.N.A. una faja de terreno con un mínimo de diez metros lineales a ambos lados de los cauces de los cuerpos de agua. Es decir, el Reglamento de Ordena-ción Territorial del Municipio de San Juan, supra —como norma general— obliga a conservar un área mayor en los márgenes de los cauces de los cuerpos de agua.
Ahora bien, el Reglamento de Ordenación Territorial del Municipio de San Juan, Tomo III, supra, establece unos distritos de ordenación especial, entre éstos, los Distritos de Ordenación Especial PET (Plan Especial Temático). És-tos precisan el ordenamiento de grandes extensiones de terreno en el territorio municipal e introducen modificacio-nes o enmiendas a la zonificación vigente. Como parte de los objetivos de los planes especiales temáticos se encuen-tra la conservación de reservas de terreno especialmente protegidas. Así, se adoptó el Plan Especial Temático Núm. 8.(9) Véase Sec. 12.08 del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, que establece una zona de conservación para los terrenos del Municipio de San Juan con relación al cauce del Río Piedras y los corre-dores ribereños. Como consecuencia, se constituyó una franja de conservación para las corrientes del Río Piedras, la Quebrada Las Curias y la Quebrada Juan Méndez de veinte metros a cada lado de los márgenes de estos cuerpos de agua. El objetivo de las franjas de conservación para la red fluvial es la reconexión de los corredores de vegetación, evitar la reducción adicional de los corredores existentes y mantener los cauces naturales de los ríos y las quebradas.
*1059 III
Con el marco doctrinal expuesto, nos corresponde dispo-ner el recurso ante nuestra consideración. Las cuestiones planteadas en el recurso presentado por Empresas Loyola fueron discutidas de forma conjunta e integrada, por estar estrechamente relacionadas entre sí. Éstas van dirigidas a controvertir la sentencia emitida por el Tribunal de Apela-ciones que revocó el desarrollo preliminar y anteproyecto aprobado por A.R.Pe. al concluir que no procede el desarro-llo puesto que contraviene la prohibición absoluta conte-nida en la Ley Núm. 206, supra.
En esencia, Empresas Loyola cuestionó que el foro ape-lativo intermedio revocó a A.R.Pe. Expuso que el Tribunal de Apelaciones erró al extender la aplicación de la Ley Núm. 206, supra, a su proyecto. Sostuvo que la propiedad a ser desarrollada no forma parte del Corredor Ecológico de San Juan. Igualmente, señaló que la finca no está identifi-cada por su número de catastro como una de las que inte-gra el Corredor Ecológico de San Juan. Expuso que la de-terminación del foro apelativo intermedio constituye una incautación no considerada por la Ley Núm. 206, supra, según enmendada. Adujo que las enmiendas realizadas a la Ley Núm. 206, supra, tuvieron el propósito de incorpo-rar el Arboretum al Corredor Ecológico de San Juan e hi-cieron referencias a las franjas o servidumbres de conser-vación a lo largo de los márgenes del Río Piedras y la Quebrada Las Curias. Además, señaló que ello no significa que se incorporara la totalidad de la finca colindante a esas áreas, sino que se protegería la porción que constituía la servidumbre de conservación. Así, argüyó que se logró el objetivo dispuesto en la Ley Núm. 206, supra, según en-mendada, al mantener un ancho de 20 metros a cada largo de los márgenes de los cuerpos de agua según requerido por el D.R.N.A., la Junta de Planificación y A.R.Pe. Asi- *1060 mismo, señaló que ello cumple con la política pública y con el Plan Especial Temático Núm. 8. El municipio de San Juan está acorde con lo expresado por Empresas Loyola y añade que el proyecto es ambientalmente viable.
Por su parte, los recurridos entienden que no procedía otorgar el permiso de construcción. Argumentan que la Ley Núm. 206, supra, aplica a la finca a desarrollarse. Los re-curridos interpretan que el listado de números de catastro incorporados en la Ley Núm. 206, supra, son solamente una porción de la zona protegida. Para ello, sostienen que el estatuto requiere la conservación de la totalidad de la zona. A su vez, arguyen que la enmienda incorporada por la Ley Núm. 260, supra, incluyó los márgenes de la Que-brada Las Curias y el Río Piedras como parte del Arboretum y, a su vez, del Corredor Ecológico de San Juan, por lo que abarca el proyecto de Empresas Loyola.(10) Aluden a la intención legislativa de la Ley Núm. 206, supra, para pro-teger el medio ambiente. Los recurridos concluyen que, como la finca a desarrollarse ubica en el área de la zona del Corredor Ecológico de San Juan por encontrarse entre la Quebrada Las Curias y el Río Piedras, es objeto de la pro-tección ambiental incorporada por la Ley Núm. 206, según enmendada. Señalan que el propósito de la Ley Núm. 206, supra, es prohibir los desarrollos de los terrenos ubicados en esta área, por lo que sostienen que no procede expedir permisos de construcción alguno en esta zona. Los recurri-dos argumentaron que requerir que se mantenga una franja de 20 metros a lo largo de los márgenes de esos cuerpos de agua es insuficiente para cumplir con la Ley Núm. 206, supra. Señalan que condicionar la emisión del permiso a la restricción territorial no fue la intención al crear el Corredor Ecológico de San Juan.
Esta exposición sobre el trasfondo de la creación del Co-rredor Ecológico de San Juan y la incorporación del Arboretum reflejan irrefutablemente que el área protegida solo *1061 incluye mil cuerdas de terrenos —en su mayoría públi-cas— que fueron debidamente identificadas por su número de catastro del Centro de Recaudaciones de Ingresos Municipales. Mediante la Ley Núm. 260, supra, se incor-poró el Arboretum al Corredor Ecológico de San Juan, que incluyó un área verde y la protección de los márgenes de los ríos y quebradas detallados. Para ello, el lenguaje uti-lizado identificó que “[s]e incluye en el Corredor Ecológico de San Juan, el área que comprende el Arboretum de Cu-pey” e incorporó “las áreas verdes de los terrenos que com-prenden los márgenes de la Quebrada Ausubo”; además, los “márgenes del Río Piedras” y “los márgenes de la Que-brada Las Curias y la Quebrada Los Guanos”. (Énfasis suplido). 12 L.P.R.A. see. 216. La prohibición para el desa-rrollo de esas áreas fue absoluta. Por ello, el estatuto con-firió al D.R.N.A. la encomienda de adquirir los terrenos privados debidamente identificados e incorporados en el Corredor Ecológico de San Juan. 12 L.P.R.A. secs. 216e y 216g.
Posteriormente, la Ley Núm. 1, supra, disipó cualquier duda sobre si la prohibición incluía la totalidad de los te-rrenos aledaños. El historial claramente refleja que la pro-hibición de desarrollo no se extendió a las fincas continuas y, mucho menos, a la totalidad de las fincas privadas que circundan el Corredor Ecológico o el Arboretum. Ésta sola-mente se extendió a los terrenos y las servidumbres legales del Estado. A estos efectos, se expresó que “la designación de un área verde protegida a lo largo del Corredor Ecoló-gico de San Juan es la de asegurar la protección de tierras públicas de sufrir impactos adicionales adversos” y que “[l]as áreas al margen de las carreteras y cuerpos de agua hasta cierta distancia son, bajo nuestro ordenamiento legal, servidumbres de uso público”. Exposición de Motivos de la Ley Núm. 1-2007.
El estudio del historial expuesto al aprobar el Corredor Ecológico de San Juan y sus enmiendas reflejan que la *1062 intención legislativa consistió en promover la conservación y el manejo de sus recursos naturales en armonía con un desarrollo juicioso de los terrenos en las zonas urbanas. En ningún momento se pretendió detener en forma absoluta el desarrollo de las áreas aledañas a los terrenos a conservarse. La Asamblea Legislativa promulgó concienti-zar sobre la necesidad de un desarrollo económico susten-table para lograr una mejor utilización de los terrenos, con-siderando el impacto ecológico que ello conlleva. Véase Informe de la Comisión de Comercio, Turismo, Urbanismo e Infraestructura del Senado de Puerto Rico sobre el P. de la C. 2701, supra.
El hecho de que la creación y conservación de las áreas identificadas responda a la preocupación de que continuar aprobando desarrollos desmedidos en el área puede impac-tar adversamente la cubierta verde y las cuencas de las quebradas, no implica una prohibición absoluta para el de-sarrollo de todos los proyectos en las fincas aledañas. Máxime cuando hemos desatacado que las áreas protegi-das fueron debidamente identificadas. La Ley Núm. 206, según enmendada, supra, así lo refleja. Nótese que el Art. 1 del estatuto designa patentemente el área protegida como “las fincas mencionadas en la sec. 216f de este títu-lo”,(11) mientras que el Art. 7 de la Ley Núm. 206, supra, detalla en una lista las fincas que componen el Corredor Ecológico de San Juan según su número de catastro, la descripción general sobre el Arboretum, las vías públicas, así como los remanentes de los terrenos pertenecientes al Gobierno y los márgenes del Río Piedras, la Quebradas Las Curias y Los Guanos.(12) Por ello, el estatuto vedó la apro-bación de permisos que no son cónsonos con la política pú-blica establecida en el área para la conservación de los te-rrenos de acuerdo con la calificación y clasificación del Reglamento de Ordenación Territorial del Municipio de *1063 San Juan, supra.(13) Dicha prohibición no impide la totali-dad de los desarrollos en las zonas colindantes.
La función de este Tribunal consiste en examinar cuida-dosamente las implicaciones de los proyectos que se desa-rrollan desde la perspectiva jurídica. Este ámbito se ciñe a estudiar si se observaron las disposiciones legales y regla-mentarias que impone el desarrollo integrado del país. En ese ejercicio, estamos limitados a examinar el cumpli-miento con las leyes para garantizar un balance necesario entre la protección de los recursos y el progreso. De esta forma garantizamos el uso eficiente de los recursos limita-dos y el mejor desarrollo de nuestros terrenos conforme al mandato constitucional. Nuestras actuaciones no deben responder a nuestro juicio sobre la sabiduría de permitir la construcción de determinado proyecto.(14)
En cuanto al recurso ante nuestra consideración, no existe controversia de que la finca de Empresas Loyola no fue una de las identificadas como parte del Corredor Eco-lógico de San Juan por su número de catastro cuando se aprobó la Ley Núm. 206, supra, ni sus enmiendas. La pro-piedad es aledaña al Arboretum y está localizada entre el Río Piedras y la Quebrada Las Curias, y contiene dos de-presiones tributarias de ésta. Como vimos, ello no conlleva que la finca forme parte del Corredor Ecológico de San Juan. Recalcamos que la finca claramente no fue incluida dentro del listado taxativo identificado por la Ley Núm. 206, supra. Por lo tanto, el Tribunal de Apelaciones erró al determinar que procede una prohibición absoluta al desa-rrollo propuesto por Empresas Loyola debido a que se pre-tende construir en el área que, según interpretó, el legisla-dor protegió en la Ley Núm. 206, supra. Sin embargo, ello no implica que el desarrollo ignore la política pública enca-minada a proteger los recursos naturales de esa área y sea *1064 cónsono con el Reglamento de Ordenación Territorial del Municipio de San Juan, supra.
Un estudio acucioso del expediente refleja que al apro-bar el anteproyecto y desarrollo preliminar, A.R.Pe. consi-deró que el proyecto fomenta la conservación de las áreas verdes arboladas existentes a lo largo del Río Piedras y de la Quebrada Las Curias. A su vez, esa agencia estudió que el terreno colinda con estos dos cuerpos de agua y que en él se localizan dos depresiones de flujo intermitente tributa-rias de la Quebrada Las Curias. Evaluó que el proyecto contempla mantener inalterada una franja de terreno con un ancho mínimo de 20 metros a lo largo del río y la que-brada para preservar en su totalidad las áreas de vegeta-ción existente en los márgenes de los cuerpos de agua. Ade-más, escudriñó que el proyecto proveería para la implantación de medidas que prevengan la erosión y sedi-mentación de éstos, la provisión de trampas de sedimento en los puntos de descarga de la escorrentía pluvial e insta-lación de mallas sintéticas.
A.R.Pe. examinó que el manejo de escorrentía pluvial mantiene inalterado los cauces de la Quebrada Las Curias y el Río Piedras, y no será necesaria la canalización o dra-gado de éstos. Igualmente, contempló que el proyecto dis-pone para la recolección de las aguas de escorrentía me-diante sistemas de captación para cada grupo de edificios y sus respectivas áreas de estacionamiento. Determinó que el proyecto cumple con los requisitos impuestos por la Junta de Planificación al aprobar la consulta de ubicación y con los endosos actualizados de distintas agencias, inclu-yendo el D.R.N.A. Así, la entidad obligada a ejercer la vi-gilancia y conservación de las aguas(15) avaló el 25 de enero de 2007 el proyecto luego de evaluar la Declaración de Im-pacto Ambiental Final sometida el 14 de febrero de 2007 por la J.C.A., que determinó que el proyecto cumple con la política pública ambiental. Al igual que A.R.Pe., el *1065 D.R.N.A. pesó el hecho de que la ubicación del área a de-sarrollarse se encuentra entre los cuerpos de agua mencio-nados y lo endosó. Al hacerlo, el D.R.N.A. requirió mante-ner una franja de 20 metros de área verde de conservación a las quebradas y del Río Piedras sin impactar y dispuso que no podrán ser utilizadas para usos distintos al propó-sito de conservación.(16) El ancho de la franja requerida satisface el Plan Especial Temático Núm. 8 para proteger el Río Piedras y sus cuencas ribereñas.
Luego de una minuciosa evaluación, A.R.Pe. aprobó el anteproyecto y el desarrollo preliminar. Para ello exigió a Empresas Loyola cumplir con los requisitos y las medidas de mitigación establecidas por la J.C.A y de la Junta de Planificación. Igualmente, requirió obtener los endosos ac-tualizados de todas las agencias antes de la certificación de los planos de construcción.
La agencia concluyó que el proyecto presentado cumple con las reglamentaciones aplicables. Es por ello que los recurridos únicamente cuestionaron ante el Tribunal de Apelaciones que el proyecto no podía ser aprobado debido a que se desarrollaría en el área adyacente al Corredor Eco-lógico de San Juan. Como explicamos, la intención legisla-tiva no sostiene la interpretación señalada por los recurri-dos y avalada por el Tribunal de Apelaciones. Independiente de tal realidad, lo expuesto refleja irrefuta-blemente que el proyecto fomenta y cumple con la política pública de conservación de las áreas verdes boscosas y pro-tección de los márgenes y cauces del Río Piedras y de la Quebrada Las Curias. Erró el foro apelativo intermedio al no estimarlo así.
Por otra parte, advertimos que el Tribunal de Apelacio-nes —como fundamento adicional para revocar a A.R.Pe.— concluyó que el proyecto a desarrollarse excedía el área de ocupación para el distrito en el que ubica. Ello no fue uno de los errores señalados ante ese foro. En su alegato ante *1066 este Tribunal, los recurridos aluden escuetamente a la con-clusión del foro apelativo. Por su parte, Empresas Loyola destaca que el proyecto cumple con todos los parámetros aplicables.
En cuanto al área de ocupación, nos limitamos a desta-car que el proyecto ubica en un área calificada como suelo urbano (SU) en un Distrito Residencial Uno (R-l). Surge de la resolución que aprueba la consulta de ubicación que la Junta de Planificación examinó el proyecto como un de-sarrollo extenso y que debido al diseño propuesto aplicó algunos de los parámetros de un Distrito Residencial Cua-tro (R-4), conforme permite la reglamentación. A su vez, el terreno forma parte de los distritos sobrepuestos de rede-sarrollo (RD-3-área urbana periferal) del Reglamento de Ordenación Territorial del Municipio de San Juan, supra. Estos se utilizan con el propósito de hacer viables los obje-tivos de desarrollar el suelo urbano y la conservación de los suelos especialmente protegidos. Los distritos sobrepues-tos solo afectan los parámetros de densidad (en función de la altura, el área bruta de construcción y el área bruta de piso). Véase Sec. 10.00 del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, pág. 162. Con-forme a la clasificación y calificación del terreno, resalta que éste se contempla para facilitar, según se justifique, las necesidades de crecimiento urbano en donde se permite la aprobación de desarrollos extensos. Véase Sec. 8.02 y Tabla I del Apéndice II del Reglamento de Ordenación Territorial del Municipio de San Juan, supra.
El terreno de Empresas Loyola está clasificado como un Distrito Residencial l(R-l). El área de ocupación en el dis-trito sobrepuesto aplicable al referido terreno es de un cin-cuenta y cinco por ciento. En estos distritos sobrepuestos se mantiene el cuarenta por ciento de la capa vegetal, por lo que no hay remoción de áreas de bosques y se mantienen los patrones de drenajes existentes con el mínimo de im-pacto posible en las obras de canalización y las pluviales. *1067 Véase Sec. 10.08 del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, pág. 174. Por tal razón, la resolución de la Junta de Planificación que aprobó la consulta de ubicación determinó que la densidad propuesta alcanza los mínimos y no excede los máximos establecidos en el Plan de Usos de Terrenos para la Región Metropoli-tana de San Juan vigente ni en el Reglamento de Ordena-ción Territorial del Municipio de San Juan, supra. Véanse: Sec. 4.04(c)(2)(b) del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, pág. 62; Resolución emi-tida por la Junta de Planificación de 14 de junio de 2007, Apéndice de la Petición de certiorari, págs. 355 — 356. Ello fue avalado por A.R.Pe., al disponer expresamente que “[e]l proyecto cumple con los requisitos establecidos por la Junta de Planificación en la Consulta de Ubicación aprobada”. Resolución de A.R.Pe. de 13 de agosto de 2008, Apéndice de la Petición de certiorari, pág. 342.
De acuerdo con ello, el desarrollo cumple con el por-ciento de área de ocupación destinado para el distrito donde ubica. Esta es una determinación altamente técnica que fue evaluada y endosada por los organismos especiali-zados y que merece la mayor deferencia por parte de este Tribunal. La evaluación realizada está dentro de la pericia de los organismos administrativos —la Junta de Planifica-ción y A.R.Pe.— al aplicar las regulaciones concernientes.
El Tribunal de Apelaciones limitó su análisis a conside-rar solamente que el área de ocupación para un distrito R-4 no puede exceder el cuarenta por ciento. Véase See. 8.02(f)(3) del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, pág. 112. Amparado en que de la resolución emitida por A.R.Pe. surge que el 52.83 por ciento del solar se utilizaría para facilidades vecinales, ca-lles y área residencial, el foro intermedio determinó que la ocupación del proyecto excede los límites establecidos y los requisitos de la Junta de Planificación. Al así actuar, no tan solo se apartó de la norma general que propende que *1068 los foros apelativos no atiendan planteamientos que no fueron traídos ante ese foro, sino que patentemente erró en su determinación al obviar los otros requisitos expuestos por la Junta de Planificación y el reglamento aplicable.(17)
En resumen, la Ley Núm. 206, según enmendada, supra, establece una política de conservación y protección de los terrenos identificados catastralmente. Esta se extiende al Arboretum y a las franjas públicas que conforman la servidumbre legal desde los cuerpos de agua compuestos por el Río Piedras, las Quebradas Ausubo, Las Curias y Los Guanos. Sin embargo, no impide el desarrollo absoluto de las áreas aledañas siempre y cuando se cumpla con los requisitos de los reglamentos aplicables. El terreno a desarrollarse por Empresas Loyola no forma parte del Corredor Ecológico de San Juan ni del Arboretum. Por lo tanto, no le aplica la prohibición absoluta de desarrollo provista por la Ley Núm. 206, según enmendada, supra. De igual forma, un estudio del proyecto evaluado refleja que éste cumple con los reglamentos aplicables, conforme determinaron las agencias concernientes. No existe razón válida en derecho que impida la aprobación del desarrollo preliminar y anteproyecto presentado por Empresas Loyola. A.R.Pe. actuó correctamente al aprobarlo.
*1069 IV
Por las razones esgrimidas, se revoca la sentencia emi-tida por el Tribunal de Apelaciones.
La Jueza Asociada Señora Fiol Matta disintió del resul-tado por considerar que contraviene la intención legisla-tiva plasmada en la Ley Núm. 206-2003 mediante la cual se creó el Corredor Ecológico de San Juan. En esa ley se expuso claramente la intención de nuestra Legislatura de proteger una de las escasas áreas de cubierta vegetal que quedan en el municipio de San Juan, proveer una zona de amortiguamiento ante el desarrollo urbano desmedido en la capital, disminuir la magnitud de las inundaciones me-diante la protección de las cuencas hidrográficas, conser-var el ecosistema de numerosas especies de flora y fauna, y brindar oportunidades educativas y recreativas a todos los sanjuaneros. La decisión mayoritaria también violenta el fin legislativo expuesto en la Ley Núm. 260-2004, que in-cluyó el proyecto de siembra ciudadana Arboretum de Cu-pey en los terrenos protegidos del Corredor Ecológico de San Juan. Esa ley contempla preservar “un gran pulmón verde” para la zona metropolitana, fomentar la colabora-ción comunitaria en la reforestación urbana, promover la siembra como medida contra la erosión del terreno, “dete-ner la destrucción de estas áreas boscosas y proteger ade-cuadamente el único río existente y el único lago que tene-mos en el Municipio de San Juan, el Río Piedras y el Lago Las Curias, al igual que sus quebradas tributarias” y fre-nar los “múltiples desarrollos propuestos que, de ser apro-bados, impactarían adversamente la cubierta verde y las cuencas” de varias quebradas “cuyas aguas son tratadas para consumo humano” y amenazan al Arboretum de Cu-pey y al Corredor Ecológico de San Juan”. La conclusión de la Opinión, además, atenta contra el propósito legislativo de “clarificar el lenguaje de la ley, manteniendo la princi *1070 pal finalidad de proteger las áreas naturales integradas en el espacio del Corredor Ecológico”, que se expresa en la Exposición de Motivos de la Ley Núm. 1 de 2007. Resulta inconcebible que, a pesar de que la Legislatura procuró la mayor protección posible —la prohibición de todo desarro-llo— para esta área por la importancia ecológica que le reconoció, se apruebe el anteproyecto para Ciudad Jardín de Cupey, un proyecto extenso en un predio que colinda con los cuerpos de agua que las leyes decidieron resguardar y por el cual pasan dos tributarias de Las Curias. Más aún cuando la razón para no proteger esta finca es que no se añadió mediante designación catastral, ya que el Arboretum se incluyó al Corredor identificándolo por lindes y no por el número de catastro. Tampoco se explica por qué to-dos los números de catastro del área comienzan por la cifra 087 mientras que el número de la finca en controversia comienza con un 114, ni por qué en el 2008 el Departa-mento de Recursos Naturales no incluyó la parcela entre las de mayor prioridad de conservación como motivo para adquisición a pesar de su ubicación adyacente a los cuer-pos de agua y la presión de desarrollo por su cercanía a las áreas comerciales. El Juez Presidente Señor Hernández Denton no intervino. La Juez Asociada Señora Rodríguez Rodríguez se inhibió. La Jueza Asociada Señora Pabón Charneco no interviene.

 Tales medidas incluyen la provisión de trampas de sedimentos en los puntos de descarga de la escorrentía pluvial, instalación de mallas sintéticas y, al final del proyecto, la provisión disipadores de energía en los muros de cabecera del sistema pluvial.

 Nos referimos a estas agencias debido a que al momento del trámite ante nuestra consideración, eran los organismos administrativos especializados que aten-dían y propiciaban el desarrollo planificado de Puerto Rico. Hoy, tanto la Ley Orgá-nica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975 *1045 (23 L.P.R.A. see. 62 et seq.), como la Ley Orgánica de la Administración de Regla-mentos y Permisos, Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 et seq.), fueron sustituidas por la Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009 (23 L.P.R.A. see. 9011 et seq.).

 La aprobación de la Ley para la Reforma del Proceso de Permisos de Puerto Rico mantuvo el mecanismo de la consulta de ubicación para la recalificación de terrenos, mediante la cual se toma una determinación final de carácter discrecional que no se considera como un permiso. Este proceso se utiliza para el uso propuesto de terrenos que no es permitido, pero que las disposiciones reglamentarias proveen que la Junta Adjudicativa de la Oficina de Gerencia de Permisos lo considere, así como los proyectos cuya densidad o intensidad es mayor a la que permite el distrito en que ubica o la proposición de un desarrollo en un solar con una cabida distinta a la permitida, entre otras situaciones. 23 L.P.R.A. see. 9011(14).

 En algunos casos, la referida etapa se realizaba ante el municipio autónomo. En el caso ante nuestra consideración, la propia Junta de Planificación estableció que la Administración de Reglamentos y Permisos (A.R.Pe.) atendería la fase operacional.

 La cuenca hidrográfica constituye el área de captación por donde discurren las aguas de escorrentías hacia un cuerpo de agua superficial. 12 L.P.R.A. see. 216a(e).

 El Reglamento de Ordenación Territorial del Municipio de San Juan, Tomo III, de la Oficina de Planificación y Ordenación Territorial de 13 de marzo de 2003, designó aproximadamente un veintiún por ciento del suelo del Municipio de San Juan como “Suelo Rústico” y “Suelo Rústico Especialmente Protegido”. Véase Ponen-cia del 19 de octubre de 2001 del Arq. Roberto Alsina, Director del Departamento de Urbanismo del Municipio de San Juan, presentada con relación al P. del S. 403. El Suelo Rústico Especialmente Protegido es el no contemplado para uso urbano o ur-banizable en un Plan Territorial, y que por su especial ubicación, topografía, valor estético, arqueológico o ecológico, recursos naturales únicos, u otros atributos, se identifica como un terreno que nunca deberá utilizarse como suelo urbano. Véase Apéndice 1 del Reglamento de Ordenación Territorial del Municipio de San Juan, supra, pág. 31.

 Al momento de la aprobación de la Ley Núm. 260-2004, más de dos mil árboles habían sido plantados.

 Ley para establecer la política pública sobre la prevención de inundaciones y para la conservación de ríos y quebradas.

 Denominado así por la Oficina de Planificación y Ordenación Territorial del Municipio de San Juan y también conocido como Plan Especial Temático 4.5, que delimita y reglamenta lo concerniente al cauce del Río Piedras y los corredores ribe-reños dentro del territorio municipal. El Plan Especial Temático Núm. 8 incorporó las recomendaciones del Informe Final de Guías de Reforestación para las Cuencas Hidrográficas de Puerto Rico, sometido al Departamento de Recursos Naturales y Ambientales (D.R.N.A.) el 3 de abril de 1998.

 Véase Alegato de la parte recurrida, pág. 7.

 12 L.P.R.A. see. 216.

 12 L.P.R.A. sec. 216f.

 12 L.P.R.A. sec. 216b.

 Véase Opinión concurrente y disidente del Juez Asociado Señor Negrón García en Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656 (1997).

 3 L.P.R.A. sec. 155(h).

 Véase Apéndice de la Petición de certiorari, págs. 128-131.

 Véase Murcelo v. H.I. Hettinger & Co., 92 D.P.R. 411, 426 (1965). Entende-mos que la actuación del foro intermedio respondió a que concluyó erróneamente que podía reconocer en apelación otro fundamento de derecho válido y adecuado para sostener lo que los recurridos le reclamaron. Véanse: E.L.A. v. Northwestern Selecta, 185 D.P.R. 40 (2012); S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 850 (2008); Hons. Castro, Cabán v. Depto. de Justicia, 153 D.P.R. 302, 312-313 (2001); Hernández v. Espinosa, 145 D.P.R. 248, 264-265 (1998), y casos allí citados; Piovanetti v. Vivaldi, 80 D.P.R. 108, 121-122 (1957); Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 694-695 (1983); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 711-712 (1965). Así, el foro intermedio consideró que A.R.Pe. cometió un error al aprobar el proyecto por entender que excedía el área de ocupación para el distrito. Actuó incorrectamente.